PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMERICAN LEGION POST 7 OF
DURHAM, NORTH CAROLINA,
                    *Plaintiff-Appellant,*

v.                                          }  No. 00-1500

CITY OF DURHAM,
                    *Defendant-Appellee.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Paul Trevor Sharp, Magistrate Judge.
(CA-98-607-1)

Argued: November 1, 2000

Decided: February 5, 2001

Before WILKINSON, Chief Judge, WILLIAMS, Circuit Judge, and
Frank J. MAGILL, Senior Circuit Judge of the United States Court
of Appeals for the Eighth Circuit, sitting by designation.

---

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Chief Judge Wilkinson and Senior Judge Magill joined.

---

## COUNSEL

**ARGUED:** James B. Craven, III, Durham, North Carolina, for Appel-
lant. Karen Ann Sindelar, Assistant City Attorney for the City of Dur-
ham, Durham, North Carolina, for Appellee. **ON BRIEF:** Joseph H.
Craven, Durham, North Carolina, for Appellant.

---

**OPINION**

WILLIAMS, Circuit Judge:

Appellant, American Legion Post 7 of Durham, North Carolina, challenges the constitutionality of the City of Durham's zoning ordinance restricting the size of publicly displayed flags, signs, banners, and other visual displays.[1] The district court granted summary judgment to the City. Because we find that the City's flag size restrictions reasonably limit the time, place, and manner of speech in a fashion that preserves ample alternative avenues for communication and is supported by the City's substantial aesthetic interests, we affirm.

I.

In 1988, the Durham City Council adopted a comprehensive sign ordinance ("the 1988 ordinance"), codified as Durham, N.C. City Zoning Ordinance § 12 (1994), which regulated the display of signs, banners, flags and other visual displays.[2] The 1988 ordinance restricted the size of publicly displayed national and state flags to 60 square feet in area and provided that such flags must be flown from a pole not more than 40 feet high. Durham, N.C. City Zoning Ordinance § 12.3 ¶ 10 (1994). The 1988 ordinance specifically provided for differential treatment for "[f]lags of this nation, state or other political subdivisions," which were regulated as "flags," as opposed to flags not meeting these content or political derivation criteria, which were regulated more stringently as "banners." *See id.* at ¶ 22 (providing a regime of more stingent regulation for "banners," and providing that "banners" containing a message or logo are regulated as "signs" and subjected to a number of additional siting, size, and display restrictions). A "substitution provision" in the 1988 ordinance, as interpreted by the City, eliminated this content-based distinction for noncommercial flags, because any display carrying a noncommercial message could be "substituted" for any permitted display, so that

---

[1]The Legion's challenge is limited to the ordinance as applied to the display of the American flag.

[2]We cite to the copy of the 1988 ordinance provided by the parties, which incorporates all changes to the City's zoning ordinances through January, 1994. (J.A. at 104-25.)

a noncommercial flag not meeting the ordinance's content criteria could nonetheless qualify for treatment as a "flag" rather than a "banner."[3] Durham, N.C. City Zoning Ordinance § 12.8.5 (1994). The City's stated purposes in enacting the 1988 ordinance included traffic safety, protection of the aesthetic environment, and promotion of economic development.[4]

Sometime in 1997, the City, enforcing its flag ordinance for the first time, cited a Bob Evans restaurant for flying a large American flag in violation of the 1988 ordinance. On June 26, 1998, the Legion held a ceremony honoring the American flag; the ceremony included representatives of the Veterans of Foreign Wars, the Marine Corps League, and the Military Order of the Purple Heart. As part of this ceremony, the Legion raised a 14 x 17 foot (238 square foot) American flag to the top of the flagpole and saluted it. On June 30, 1998, the City served upon the Legion a Notice of Violation alleging that the Legion had violated the 1988 ordinance by displaying an oversized flag, demanding that the Legion correct this violation within two days, and threatening financial penalties and possible criminal prosecution in the event of noncompliance.

In 1997, following the issuance of the Bob Evans restaurant citation, the City began to consider possible revisions to the 1988 ordinance. This process culminated with the enactment on August 3, 1998, slightly more than one month after issuance of the Legion's citation, of a revised flag ordinance ("the 1998 ordinance"), codified as Durham, N.C. City Zoning Ordinance § 8.1.27. The 1998 ordinance replaced the fixed 60-square-foot flag size limit with a flexible

---

[3]The substitution provision, which is still in effect, provides that "[n]oncommercial signs are allowed in all districts and may be substituted for any sign expressly allowed under this ordinance." Durham, N.C. City Zoning Ordinance § 12.8.5 (1994).

[4]The City has produced an affadavit indicating that the ordinance serves these purposes. The Legion has produced affidavits tending to cast doubt on the rational connection between the ordinance and these goals. An affidavit from a registered land surveyor states that the Legion's flag could not pose a traffic safety hazard, and an affidavit from a realtor states that the Legion's flag "will have only a positive effect on . . . property values" in the area. (J.A. at 37-40).

limit based upon flagpole height, which in turn was limited based upon the area's zoning designation. *See id.* at ¶¶ 2, 3. In nonresidential districts, a flagpole with a maximum height of 70 feet bearing a flag or flags of up to 216 square feet is permitted. In a residential district, such as the one in which the Legion's property is located, flagpole height is limited to 25 feet and thus, flag size is limited to 40 square feet. *See id.* at ¶¶ 2 3. The 1998 ordinance also requires flags to be displayed on flagpoles; prohibits the construction of more than three flag poles on a given property; prohibits the display of more than two flags on a flagpole; establishes a setback requirement for flagpoles, and further restricts flags containing commercial messages by rendering the separate provisions of the City's sign ordinance applicable to such flags. *See id.* at ¶¶ 2-7. The 1998 ordinance also replaced the content-based distinctions of the 1988 ordinance with a definition of a "flag" as "a piece of fabric or other flexible material solely containing distinctive colors, patterns, standards, words or emblems used as a symbol of an organization or entity, including but not limited to political jurisdictions . . . ." *Id.* at ¶ 1.

On July 14, 1998, the Legion filed a complaint against the City, alleging that the 1988 ordinance violated the First Amendment insofar as it regulated the display of American flags. The suit sought injunctive relief, a declaratory judgment that the ordinance was unconstitutional, damages, and costs. After the City amended the ordinance on August 3, 1998, the Legion amended its complaint to include claims similar to those raised in the original complaint regarding the new ordinance. Both sides consented to determination of the case before a United States magistrate judge and filed motions for summary judgment and supporting affidavits.[5] On March 21, 2000, the district court denied the Legion's summary judgment motion, granted summary judgment for the City, and entered final judgment for the City. The Legion filed its notice of appeal on April 17, 2000.

In this appeal, the Legion argues that the district court erred in holding that its challenge to the City's now-superseded 1988 ordi-

---

[5]28 U.S.C.A. § 636 (West 2000), provides that with the consent of the parties and the approval of the district court, a United States Magistrate Judge may "conduct any or all proceedings . . . and order the entry of judgment in the case." 28 U.S.C.A. § 636(c)(1) (West 2000).

nance is moot. The Legion further argues that the 1998 ordinance is content-based and is thus subject to heightened First Amendment scrutiny. In response, the City argues first that its 1998 ordinance does not burden speech to any significant degree, so that the district court erred in applying the time, place, and manner analysis elucidated by the Supreme Court in *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The City argues second that if the 1998 ordinance does burden speech, the ordinance is content-neutral and therefore should be evaluated under *Clark*; the City contends that the ordinance meets this standard. We understand the Legion to counter that, assuming the ordinance is analyzed under the less onerous *Clark* test, it fails to meet those standards because it is not narrowly tailored and the record does not support a finding that, as applied to the Legion, the ordinance furthers any significant government interest. We address each argument in turn, reviewing the district court's grant of summary judgment de novo. *See Providence Square Assoc., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000) (reviewing a grant of summary judgment de novo). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether there is a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II.

The Legion has attacked both the 1988 ordinance, under which it was cited in the incident giving rise to this action, and the 1998 ordinance. The district court found that the claim that the 1988 ordinance was unconstitutional was mooted by the City's subsequent amendment of that ordinance because "there is no real or imminent threat . . . that Defendant will reenact the [1988] ordinance at any time in the future." (J.A. at 248.)

The Legion argues that the district court erred in finding that the claims as to the 1988 ordinance were moot. The Legion argues that without a definitive ruling as to the 1988 ordinance's constitutional-

ity, the City remains free to re-enact that ordinance at any time. (Appellant's Br. at 13-15.) *See also National Advertising v. City of Fort Lauderdale*, 934 F.2d 283, 285-86 (11th Cir. 1991) (holding that because "[i]t remains uncertain whether the City would return the sign code to its original form if it managed to defeat jurisdiction in this case," a live case or controversy exists and the district court erred in mooting claim based on amended ordinance).

Mootness is primarily a function of the Article III "case or controversy" limitation on the jurisdiction of the Federal courts.[6] *See id.* at 286 (noting that moot cases cannot meet the Article III standard). The Legion observes, correctly, that the mere amendment or repeal of a challenged ordinance does not automatically moot a challenge to that ordinance. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (stating that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," and holding that since nothing prevents a municipality from reenacting challenged provisions, a challenge to these provisions is not moot); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) (observing that "mere voluntary cessation of illegal conduct does not moot a case . . . .").

*Aladdin's Castle*, however, is distinguishable because in that case, the city had repeatedly amended the ordinance at issue in response to court rulings and had announced its intention to re-enact the challenged provision if the judgment in question was vacated on mootness grounds. *See Aladdin's Castle*, 455 U.S. at 289 n.11. The City argues that it has demonstrated that it will not re-enact the challenged 1988 ordinance, because the process which led to the enactment of the 1998 ordinance began seven months before this case was filed in the district court and the ordinance was revised long before the district court ruled in this case. (Appellee's Brief at 32.)

The Supreme Court has held that in some circumstances, the repeal or amendment of a statute moots a challenge even where re-enactment of the statute at issue is within the power of the legislature. *See Mas-*

---

[6]*But see Honig v. Doe*, 484 U.S. 305, 330 (1994) (Rehnquist, C.J., concurring) (arguing that the mootness doctrine should be viewed as prudential and not based on the Constitution).

*sachusetts v. Oakes*, 491 U.S. 576, 582 (1989) (holding that the amendment of a law prohibiting nude photography of minors mooted First Amendment overbreadth challenge to law); *Kremens v. Bartley*, 431 U.S. 119, 132 (1977) (holding that the repeal of a statute permitting involuntary commitment of juveniles mooted challenge to statute). The practical likelihood of reenactment of the challenged law appears to be the key to the Supreme Court's mootness jurisprudence in situations such as this one. *See* Erwin Chemerinsky, *Federal Jurisdiction* 139 (3d ed. 1999) (summarizing the Supreme Court's jurisprudence by stating that "cases will not be dismissed as moot if the Court believes there is a likelihood of reenactment of a substantially similar law if the lawsuit is dismissed").

Here, we agree with the district court that there is little likelihood of the City reenacting the 1988 ordinance if the district court's finding of mootness is affirmed. Thus, the district court was correct in its mootness ruling. We do not, therefore, address the merits of the claim that the 1988 ordinance is unconstitutional.

III.

In evaluating the 1998 ordinance, we first confront the threshold issue of whether it burdens speech and thus is subject to First Amendment scrutiny. The City argues that the Legion failed to provide any evidence indicating that its ability to communicate its message was impaired by the City's flag size restriction, and thus the district court erred in performing a First Amendment analysis because the 1998 ordinance does not burden speech at all. (Appellee's Brief at 14, 16.) We proceed in analyzing this issue by comparing the nature and magnitude of the 1998 ordinance's burden on speech with the burden present in other cases in which courts have found a sufficient burden on speech to render First Amendment scrutiny appropriate. We ultimately conclude that the Legion produced adequate evidence that the City's 1998 ordinance burdens speech, because the display of a flag of a given size is communicative activity and the Legion demonstrated that the ordinance directly restricts the Legion's communicative activity.

While the 1998 ordinance burdens speech to a lesser degree than the regulations at issue in various cases cited by the City, *see, e.g.*,

*Arlington County Republican Comm. v. Arlington County*, 983 F.2d
587, 594 (4th Cir. 1993) (invalidating, under the First Amendment, a
municipal ordinance imposing a two-sign limit in residential zones),
the City cites no authority for its proposition that an "entire medium
of communication or a portion of such medium," must be foreclosed
in order for a regulation to burden speech. (Appellee's Brief at 16.)
Indeed, while we did not perform an extensive "burdening speech"
analysis in *Arlington County*, we suggested that even a minor burden
on speech is sufficient to trigger a First Amendment analysis. In
approaching a First Amendment challenge to the two-sign limit at
issue in *Arlington County*, we stated that "we first question whether
the two-sign limit burdens *any* speech. If we find *any* burden, we
must then determine whether the two-sign limit imposes content neu-
tral or content based restrictions." *Arlington County*, 983 F.2d at 593
(emphasis added). We reasoned that the two-sign limit "affects speech
rather than conduct," because "'[c]ommunication by signs and posters
is virtually pure speech.'" *Id.* (quoting *Baldwin v. Redwood City*, 540
F.2d 1360, 1366 (9th Cir. 1976)). We further noted that the two-sign
limit prevented homeowners from expressing support for more than
two candidates, a concern of particular significance "if two voters liv-
ing within the same household support opposing candidates." *Id.* at
594. We did not ask, as part of the threshold "burdening speech" anal-
ysis, whether the two-sign limit imposes a *great* burden on speech,
but rather, formulated the test as whether "any" burden exists, and
relied principally on the proposition that a direct limitation on the
"pure speech" at issue constituted a burden on speech. *Id.* at 593-94.

It is clear that the 1998 ordinance burdens speech. The Legion was
cited by the City for flying an oversized and well recognized symbol
of political speech. Flags, especially flags of a political sort, enjoy an
honored position in the First Amendment hierarchy. One may engage
in protected speech by burning a flag, *see Texas v. Johnson*, 491 U.S.
397, 406 (1989), or by affixing a peace symbol to a flag and flying
it upside down, *see Spence v. Washington*, 418 U.S. 405, 409-10
(1970). It, therefore, is clear that the Legion's avowed attempt to
demonstrate intensity of patriotic feeling by flying a very large flag
implicates First Amendment interests, at least to a sufficient degree
to cause the City's ordinance to burden speech. The City's limit on
the size of flags directly limits speech and seems closely analogous
to the New York City restriction on rock concert volume in Central

Park that was the subject of *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). In *Ward*, the Supreme Court upheld as a valid time, place, and manner restriction a scheme designed to limit the volume of musical performances in Central Park. The Court's use of a time, place, and manner analysis implicitly recognized a threshold burden on speech. *See id.* at 803. The major distinction between *Ward* and this case, that *Ward* involved music rather than the display of political flags (which are if anything even closer to the core of expression protected by the First Amendment),[7] favors the Legion's position. *Cf. Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (suggesting that sleeping overnight in a tent city erected on the Washington Mall was "expressive conduct protected to some extent by the First Amendment," sufficient to trigger the application of time, place, and manner analysis). If regulation of the volume of music at a rock concert or regulation of one's ability to sleep in a mock tent city constitutes a burden on speech, surely a limit on the size of a publicly-displayed political symbol burdens speech. The decisions of the Supreme Court and this Court indicate that the amount of burden on speech needed to trigger First Amendment scrutiny as a threshold matter is minimal.

## IV.

The Legion contends that the 1998 ordinance is content-based and thus should be subject to heightened First Amendment scrutiny. The City responds that its 1998 ordinance is content-neutral because it does not facially distinguish between flags based on the messages that they convey and because there is no evidence that, in enacting the ordinance, the City was motivated by a content-based purpose. *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 643 (1994) (indicating that, in most cases, whether a law benefits or burdens speech by referring to content on its face is determinative of the law's

---

[7]*See*, *e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404-05 (1989) (noting that attaching a peace sign to the American flag, refusing to salute the flag, and flying a red flag "all may find shelter under the First Amendment"); *West Virginia Bd. of Education v. Barnette*, 319 U.S. 624, 632 (1943) ("Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution or personality, is a short cut from mind to mind.").

content-based or content-neutral character). The Legion notes that a content-based purpose can be used to show that a regulation which is facially content-neutral is in fact content-based. *See id.* at 642. The Legion does not, however, suggest that the City had any content-based purpose in enacting the 1998 ordinance, nor does it provide any evidence of such a purpose. Ultimately, the Legion's argument reduces to a claim that the 1998 ordinance is not content-neutral on its face because the ordinance regulates flag size. Size, however, is not a content criterion. *See Foti v. City of Menlo Park*, 146 F.3d 629, 640-41 (9th Cir. 1998) (holding that a regulation of the size and number of signs used in picketing was content-neutral).

The Legion alludes to the "commercial/noncommercial difference" as one possible basis for a finding that the 1998 ordinance is content-based, without explaining the nature of the commercial/noncommercial difference to which it alludes and without presenting a developed argument as to how this difference renders the ordinance content-based. (Appellant's Br. at 18.) That some differential treatment is permitted on the basis of speech's commercial or noncommercial character would seem to be a necessary implication of the Supreme Court's use of different constitutional tests for regulations of commercial versus noncommercial speech. *Compare Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 564 (1980) (providing that for a content-based restriction on commercial speech, the government must show that it has a substantial interest, the regulation directly advances that interest, and the regulation is not more extensive than necessary to serve that interest), *with Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (holding that a content-based restriction on noncommercial expression must be "necessary to serve a compelling state interest."). *See also Metromedia Inc. v. City of San Diego*, 453 U.S. 490, 506 (1981) (stating that "we continue to observe the distinction between commercial and noncommercial speech, indicating that the former [can] be forbidden and regulated in situations where the latter [cannot] be").

The 1998 ordinance restricts flags containing commercial messages more stringently than flags containing noncommercial messages; flags containing commercial messages must comply with the restrictions imposed by the sign ordinance, Durham, N.C. City Zoning Ordi-

nance § 12.1 *et seq.*, which are more stringent than the restrictions imposed by the flag ordinance. *See* Durham, N.C. City Zoning Ordinance § 8.1.27 ¶ 6 (providing that "[f]lags displaying a logo, message, statement, or expression relating to commercial interests . . . must also conform with all sign regulations under Section 12" of the City/County Zoning Ordinance). We do not take the Legion to argue that the ordinance's more stringent regulation of commercial messages constitutes a content-based restriction. To the contrary, the Legion disclaims any attempt to assert that the regulation excessively restricts commercial speech, stating that "this case is not about how large a flag" businesses can fly. (Appellant's Br. at 26.) The Legion argues instead that the 1998 ordinance is overbroad because it includes noncommercial as well as commercial displays of the American flag, while the Legion believes that the City's concerns justify mainly a restriction on the display of flags by businesses. (Appellant's Br. at 31.) Thus, the Legion does not argue that the rationale of *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993), renders § 8.1.27 ¶ 6 of the 1998 ordinance content-based. *See id.* (holding that a regulation prohibiting the placement of public display boxes for "commercial handbills," but which permitted the placement of such boxes for "noncommercial" publications, drew a distinction that was not justifiable in terms of the government's proffered interests in regulating and was sufficient to render the regulation content-based).[8]

We conclude that the 1998 ordinance is content-neutral because it does not facially distinguish between noncommercial messages based on content and because there is no evidence of a content-based purpose. Thus, the three-part test for a content-neutral regulation of the time, place, and manner of speech, as elucidated by the Supreme

---

[8]The Supreme Court's finding that the display box regulation was content-based negated any claim that it was a permissible time, place, and manner restriction. *See City of Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993). Applying the *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 564 (1980), test for content-based restrictions on commercial speech, the Court found that Cincinnati's commercial/noncommercial distinction bore "no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests." *Id.* at 424 (emphasis in original).

Court in *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984), provides the proper standard against which to determine the 1998 ordinance's constitutionality.[9]

V.

Having concluded that we should apply the time, place, and manner test because the 1998 ordinance is content-neutral, we next turn to the question of whether the ordinance meets the standard for permissible time, place, and manner restrictions. A content-neutral regulation of the time, place, and manner of speech is generally valid if it furthers a substantial government interest, is narrowly tailored to further that interest, and leaves open ample alternative channels of communication. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (stating and applying this standard to a regulation prohibiting protesters from sleeping overnight in a mock tent city on the Washington Mall).

The City argues that the 1998 ordinance furthers its substantial interest in "maintaining and improving the community's appearance, eliminating visual clutter, ensuring traffic safety, preserving property values, and attracting sources of economic development." (Appellee's Br. at 20.) The district court correctly found that under relevant Supreme Court and Fourth Circuit precedent, a community's interest in preserving its aesthetic character is indeed a "substantial interest."

---

[9]In addition to providing the *Clark* standard for time, place, and manner regulations, the Supreme Court has stated that a regulation of expressive conduct is valid if it furthers an important or substantial governmental interest unrelated to the suppression of free expression and if the incidental restriction on protected expression is no greater than is essential to furtherance of that interest. *United States v. O'Brien*, 391 U.S. 367, 377 (1968). The Supreme Court has indicated, however, that the *O'Brien* test is "little, if any, different from the standard applied to time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984). Because the display of a flag is "virtually pure speech," *Baldwin v. Redwood City*, 540 F.2d 1360, 1366 (9th Cir. 1976), we believe that, as a formal matter, this case fits more comfortably within the *Clark* time, place, and manner test than the *O'Brien* expressive conduct test, and therefore we apply *Clark*. As *Clark* indicates, however, little is likely to turn on the distinction.

*See Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984) (stating that "[i]t is within the constitutional power of the City to improve its appearance"); *Arlington County Republican Comm. v. Arlington County*, 983 F.2d 587, 594 (4th Cir. 1993) (stating that traffic safety and aesthetics are "substantial government goals"). *Vincent* clearly forecloses the argument that the City's interest is insubstantial; the *Vincent* Court stated that "municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression," sufficient to pass muster under the time, place, and manner test. *Taxpayers for Vincent*, 466 U.S. at 806.

The Legion cites decisions holding that aesthetics do not constitute a *compelling* governmental interest sufficient to justify a content-based restriction. *See, e.g., Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993) (holding, in the context of a facial overbreadth challenge, that a regulation supported by aesthetic concerns is not supported by sufficient government interests to validate content-based regulation); *Village of Schaumburg v. Jeep Eagle Sales Corp.*, 676 N.E.2d 200, 204 (Ill. App. 1996) (finding that "[t]raffic safety and visual aesthetics are not the sort of compelling state interest required to justify a content-based restriction on expression). These cases are inapposite because they do not address whether aesthetics constitute a substantial, as opposed to a compelling, government interest. We find that the City's asserted aesthetic interests are indeed sufficient to satisfy the "substantial government interest" prong of the *Clark* test for the validity of a content-neutral time, place, and manner restriction.[10]

The Legion further argues that the 1998 ordinance is not narrowly tailored and thus fails *Clark*'s second prong, because although the ordinance primarily aims to eliminate commercial use of large flags, it also applies to noncommercial entities. (Appellant's Br. at 25.) We note that the requirement that a statute be narrowly tailored under the

---

[10]While some conflict in the evidence exists regarding the extent to which the ordinance served the asserted traffic safety and property values purposes, the Legion raised no issue of material fact regarding the City's aesthetic justifications, which are legally sufficient to meet the first prong of the *Clark* test.

*Clark* time, place, and manner test is not a least intrusive means requirement; this prong of the *Clark* test merely asks whether "'the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989) (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). A time, place, and manner regulation is not narrowly tailored, however, if "a substantial portion of [its] burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. Here, the City argues persuasively that the efficacy of its overall scheme of sign and display regulation would be undermined either by exempting flags or by exempting noncommercial entities from the strictures of the ordinance. (Appellee's Br. at 28-30.) Because the City's asserted reasons for enacting the 1998 ordinance are not limited to controlling commercial flag displays but encompass a more general set of aesthetic concerns, we find that the 1998 ordinance is narrowly tailored to combat the aesthetic injury which the City supposes would occur if large flag displays were permitted. While the Legion produced affidavits in the district court proceedings below tending to show that the 1998 ordinance is overbroad from a traffic safety and property values standpoint, the Legion did not demonstrate that the ordinance burdens more speech than necessary to ensure that the City's aesthetic interests are vindicated.

The final portion of the time, place, and manner inquiry asks whether the challenged regulation leaves open "ample alternative channels for communication." *Clark*, 468 U.S. at 293. The Supreme Court's invalidation of a municipal sign ordinance against proffered aesthetic justifications in *City of Ladue v. Gilleo*, 512 U.S. 43, 59 (1994), rested on this portion of the time, place, and manner test. In *Ladue*, a municipality prohibited all publicly-displayed signs on private property, subject to a few narrow exceptions; its ordinance was applied to prohibit an individual from displaying a small window sign signaling opposition to the Persian Gulf War. *Id.* at 45-47. The Supreme Court, noting that "[m]ost Americans would be understandably dismayed . . . to learn that it was illegal to display from their window an 8- by 11-inch sign expressing their political views," struck down the city's sign ordinance. *Id.* at 58. The Court reasoned that the city's ordinance "foreclose[d] an entire medium of expression" and did not leave an adequate substitute. *Id.* at 56. Further, the Court relied, in distinguishing the posting of signs on public property in

*Taxpayers for Vincent*, on the "special respect for individual liberty in the home [that] has long been part of our culture and our law" and which has "special resonance when the government seeks to constrain a person's ability to *speak* there." *Id.* at 58.

This case occupies ground between *Taxpayers for Vincent* and *City of Ladue* with respect to the private property issue, in that the Legion seeks to speak, through its flag, on private property but not in the home. This case is not controlled by *Ladue*, however, because the burden on speech is far more attenuated than the complete ban at issue in that case. Indeed, the *Ladue* Court recognized that not every kind of sign must be permitted in residential areas, noting, "[w]e also are not confronted here with mere regulations short of a ban." *Id.* at 58 n.17. Because the 1998 ordinance merely establishes a relatively liberal set of limits on flag size and provides a procedure for obtaining temporary and permanent waivers by means of a "special use" permit,[11] it is a "mere regulation[ ] short of a ban" under *Ladue* and does not implicate First Amendment interests to a sufficient degree to fail this portion of the time, place, and manner test. *Id.*

We conclude that the City's 1998 ordinance is valid under each portion of the *Clark* time, place, and manner test because it advances a substantial government interest in preservation of the aesthetic environment, is reasonably well tailored to serve that goal, and leaves open ample alternative avenues of expression.

## VI.

In conclusion, the district court correctly found that the Legion's challenge to the 1988 ordinance was moot and correctly held that the City of Durham's 1998 ordinance effected a permissible time, place,

---

[11]*See* Durham, N.C. City Zoning Ordinance § 8.1.27 ¶ 2 (providing for a waiver of the flagpole size limits in residential districts via a special use permit granted by the City Board of Adjustment). The Legion does not argue that the "special use" permit procedure improperly vests unbridled discretion in the City Board of Adjustment. Further, the 1998 ordinance contains an automatic, blanket suspension of the flag size limits on United States and North Carolina holidays. *See* Durham, N.C. City Zoning Ordinance § 8.1.27 ¶ 9.

and manner regulation of speech. The judgment of the district court is therefore affirmed.

*AFFIRMED*