**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 13-2389**

———————

ROBERT S. REYNOLDS,

> Plaintiff - Appellant,

> v.

DOUGLAS A. MIDDLETON,

> Defendant - Appellee.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.    John A. Gibney, Jr., District Judge.  (3:12-cv-00779-JAG)

———————

Argued: October 28, 2014            Decided: February 24, 2015

———————

Before TRAXLER, Chief Judge, DIAZ, Circuit Judge, and DAVIS, Senior Circuit Judge.

———————

Vacated and remanded by published opinion.  Chief Judge Traxler wrote the opinion, in which Judge Diaz and Senior Judge Davis joined.

———————

**ARGUED**: Brian Timothy Burgess, GOODWIN PROCTER LLP, Washington, D.C., for Appellant.  Andrew Ramsey Newby, OFFICE OF THE COUNTY ATTORNEY, Henrico, Virginia, for Appellee.  **ON BRIEF**: William M. Jay, Washington, D.C., Kevin P. Martin, GOODWIN PROCTER LLP, Boston, Massachusetts, for Appellant.  Joseph P. Rapisarda, Jr., Lee Ann Anderson, COUNTY OF HENRICO, Henrico, Virginia, for Appellee.

———————

TRAXLER, Chief Judge:

Robert Reynolds is homeless and supports himself by soliciting donations in Henrico County, Virginia. Reynolds brought an action raising First Amendment challenges to a Henrico County ordinance that prohibits solicitation within County roadways. The district court granted summary judgment in favor of the County, and Reynolds appeals. For the reasons that follow, we vacate the grant of summary judgment and remand for further proceedings.

I.

Prior to 2012, Henrico County had an ordinance that prohibited those "standing" in County roadways, which the ordinance defined to include the medians, from distributing handbills, soliciting contributions, or selling merchandise to car drivers or passengers. Roadway solicitors got around the ordinance by soliciting funds while <u>sitting</u> in the medians.

Police Chief Douglas Middleton, the named defendant, urged the Henrico County Board of Supervisors to consider amending the ordinance to prohibit all roadway solicitation while standing or sitting. At a public hearing on the issue, Middleton stated that the number of people soliciting while sitting in medians had increased "[i]n the past few years and particularly the current year," J.A. 63, and that this increase had led to an increased number of complaints from citizens. Middleton

2

explained that he believed soliciting from the median was dangerous to the solicitors and to drivers and that prohibiting median-solicitation would make the roads safer. Middleton stated that "as chief of police I cannot ignore the increasingly present danger that the current activities are creating, [and] I would rather proceed to avoid a tragedy, and I am responding to that in a proactive manner as opposed to being reactive." J.A. 64.

Middleton did not consult traffic-safety or other experts before seeking the changes to the ordinance, but based his proposal on his opinion that it is unsafe to solicit "in the highway," an opinion that he based on his "personal observations, the credible reports of other law-enforcement officers and citizens, and [his] experience as a law-enforcement officer for over 40 years." J.A. 60. Middleton did not give any specific examples of accidents or other problems caused by median-solicitors in his deposition testimony or in his statements at the public hearing.

The County Attorney's Office prepared a report addressing solicitation on County highways. The report stated that there had been an "increased presence of [roadway solicitors] in County highways, especially in the medians of numerous intersections in the West End of the County," J.A. 29, and that "[n]umerous complaints have been received from County citizens

3

over the past several months," J.A. 30. According to the report, police received "97 calls for service concerning panhandling" in 2011 and received 93 such calls in the first 8 months of 2012. J.A. 31. There is no other empirical evidence in the record of actual problems caused by panhandling or soliciting from medians.

The Board of Supervisors agreed with Middleton and voted to amend the ordinance. The amended version of the ordinance (the "Amended Ordinance") provides as follows:

Sec. 22-195. Distributing handbills, soliciting contributions or selling merchandise or services in highway.

(a) It shall be unlawful for any person while in the highway to:

(1) Distribute handbills, leaflets, bulletins, literature, advertisements or similar material to the drivers of motor vehicles or passengers therein on highways located within the county.

(2) Solicit contributions of any nature from the drivers of motor vehicles or passengers therein on highways located within the county.

(3) Sell or attempt to sell merchandise or services to the drivers of motor vehicles or passengers therein on highways located within in the county.

(b) For purposes of this section, the term "highway" means the entire width of a road or street that is improved, designed, or ordinarily used for vehicular travel and the shoulder, the median, and the area between the travel lane and the back of the curb.

4

J.A. 16. Given the definition of "highway," the Amended Ordinance prohibits a homeless person from sitting (or standing) in a median with a sign asking for donations or offering to work in exchange for food, but it permits, for example, campaign workers with signs urging drivers to vote for their candidate to gather in the medians. Solicitation and other activities prohibited on the highways and medians remain permissible on County sidewalks, which are not included in the definition of "highway."

Acting pro se, Reynolds brought this action challenging the Amended Ordinance on First Amendment grounds. Reynolds and the County cross-moved for summary judgment. The district court denied Reynolds' motion and granted the County's. The court recognized that streets and medians are traditional public forums, but the court nonetheless upheld the Amended Ordinance as a content-neutral and narrowly tailored time, place, and manner restriction on speech. This appeal followed.

II.

There is no question that panhandling and solicitation of charitable contributions are protected speech. See Clatterbuck v. City of Charlottesville, 708 F.3d 549, 553 (4th Cir. 2013). There is likewise no question that public streets and medians qualify as "traditional public forum[s]." Id. at 555; see Warren v. Fairfax Cnty, 196 F.3d 186, 196 (4th Cir. 1999) (en

5

banc) ("Median strips, like sidewalks, are integral parts of the public thoroughfares that constitute the traditional public fora.").

The government's power to regulate speech in a traditional public forum is "limited, though not foreclosed." Clatterbuck, 708 F.3d at 555. Content-neutral time, place, and manner regulations of speech in traditional public forums are subject to intermediate scrutiny – that is, the restrictions must be "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." Id.; see Ross v. Early, 746 F.3d 546, 552-53 (4th Cir.), cert. denied, 135 S. Ct. 183 (2014). A content-neutral regulation is narrowly tailored if it does not "burden substantially more speech than is necessary to further the government's legitimate interests." McCullen v. Coakley, 134 S. Ct. 2518, 2535 (2014) (internal quotation marks omitted). To be valid, the regulation "need not be the least restrictive or least intrusive means of serving the government's interests. But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Id. (internal quotation marks omitted).

Reynolds, now represented by counsel, challenges the district court's decision upholding the Amended Ordinance. Reynolds argues that the County bears the burden of proof and

6

that the County's evidence was insufficient to establish that the Amended Ordinance is narrowly tailored or that it leaves open ample alternative channels of communication.[1]

## III.

We begin with the burden of proof. "[W]here a plaintiff claims suppression of speech under the First Amendment, the plaintiff bears the initial burden of proving that speech was restricted by the governmental action in question." Lim v. City of Long Beach, 217 F.3d 1050, 1054 n.4 (9th Cir. 2000); see American Legion Post 7 v. City of Durham, 239 F.3d 601, 606 (4th Cir. 2001) (threshold determination triggering application of First Amendment scrutiny is whether challenged regulation burdens speech). After the plaintiff makes his initial showing, the burden then falls on the government to prove the constitutionality of the speech restriction. See McCullen, 134 S. Ct. at 2540 ("To meet the requirement of narrow tailoring, the government must demonstrate [that the speech restriction

---

[1] Reynolds expressly does not challenge the district court's determination that the Amended Ordinance is content- neutral, and we therefore do not consider that issue. We note that the Supreme Court recently heard argument in a case involving the content-neutrality of a town ordinance regulating temporary signs. See Reed v. Town of Gilbert, S. Ct. Docket No. 13-502 (argued Jan. 12, 2015). In the event the Supreme Court's decision in Reed undermines the district court's analysis of the neutrality issue, the district court on remand will be free to reconsider the issue. See, e.g., TFWS, Inc. v. Franchot, 572 F.3d 186, 191 (4th Cir. 2009) (noting exception to the law-of-the-case doctrine for change in controlling legal authority).

7

meets the relevant requirements]." (emphasis added)); see also Edenfield v. Fane, 507 U.S. 761, 770 (1993) ("It is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it." (internal quotation marks and alteration omitted)).

Here, Reynolds made the necessary threshold showing. As discussed, solicitation of charitable contributions is speech, and Reynolds alleged in his verified complaint that the Amended Ordinance inhibits his ability to collect donations by requiring him to move to locations where it is more difficult for drivers to make contributions.[2] See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (verified complaint "is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge"). The County was therefore obligated to prove that the Amended Ordinance is narrowly tailored to further a significant government interest and that it leaves open ample alternative channels of communication.

The more difficult issue -- and the issue on which this appeal turns -- is determining precisely what the County must present in order to carry its burden of proof. The County

_____

[2] As Reynolds explained in his complaint, "forcing him out of the roadway results in the drivers['] inability to hand him money because they cannot reach across the passenger seat and usually several more feet into Reynolds' hand." J.A. 9.

contends that intermediate scrutiny "does not always require an evidentiary showing," Brief of Respondent at 20, and that it is entitled to rely on common sense and logic, as well case law and the experience of other jurisdictions, when defending the Amended Ordinance.

The County's formulation certainly finds support in our precedent. We have not required an evidentiary record to uphold a speech regulation that is materially indistinguishable from one that has been found constitutional by this court or the Supreme Court. See Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 365 n.3 (4th Cir. 2012) ("[C]onsistent with over thirty years of case law from the Supreme Court and our court, [the County defendant] has established that the Sign Ordinance passes constitutional muster under the rubric of intermediate scrutiny. It need not reinvent the wheel by coming forward with voluminous evidence justifying a regulation of the type that has been upheld several times over.").[3] Likewise, we generally have not

---

[3] Unlike the sign and billboard regulation in Wag More Dogs, however, the Amended Ordinance is not one of a type that has consistently been found constitutional. Courts have struck down some solicitation bans and upheld others, with the outcome turning on the details and wording of the various regulations (such as whether the ban applied to medians) as well as the evidentiary record developed by the parties. See, e.g., Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 949 (9th Cir. 2011) (en banc) (striking down ordinance banning solicitation of employment or contributions from all city streets and medians in part because the City introduced
(Continued)

required the government to present evidence to show the existence of a significant governmental interest; common sense and the holdings of prior cases have been found sufficient to establish, for example, that the government has a significant interest in public safety. See Ross, 746 F.3d at 555; American Legion Post 7, 239 F.3d at 609; cf. United States v. Chapman, 666 F.3d 220, 226-27 (4th Cir. 2012) (recognizing that "common sense and case law" can establish the existence of governmental interest in Second Amendment case subject to intermediate scrutiny).

As to the other narrow-tailoring requirements, our cases have not been entirely clear about what the government must present in order to carry its burden. For example, we have held that intermediate scrutiny "requires the government to produce evidence that a challenged regulation materially advances an important or substantial interest by redressing past harms or preventing future ones." Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 515 (4th Cir. 2002) (emphasis added; internal

---

evidence of traffic problems as to a few major streets and medians but "offered no evidence to justify extending its solicitation ban throughout the City in such a sweeping manner"); Int'l Soc. for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge, 876 F.2d 494, 498 (5th Cir. 1989) (discussing evidence presented at trial when upholding ordinance prohibiting solicitation of employment, business or charitable contributions from occupants of vehicles on street (defined to include medians)).

quotation marks omitted). We have explained that although the government need not "present a panoply of empirical evidence in order to satisfy this standard, it must nonetheless make some evidentiary showing that the recited harms are real, not merely conjectural, and that the [challenged regulation] alleviates these harms in a direct and material way." Ross, 746 F.3d at 556 (emphasis added; citations, internal quotation marks and alteration omitted). While these cases seem to insist on evidence, we have in some cases nonetheless relied on things other than objective evidence when determining that speech restrictions advanced the government's asserted interest. See, e.g., Ross, 746 F.3d at 556 (relying on "appeals to common sense and logic" (internal quotation marks omitted)); Educational Media Co. at Va. Tech., Inc. v. Swecker, 602 F.3d 583, 589 (4th Cir. 2010) (relying on "history, consensus, and common sense").

In our view, however, the Supreme Court's recent decision in McCullen v. Coakley clarifies what is necessary to carry the government's burden of proof under intermediate scrutiny. McCullen involved a First Amendment challenge to a Massachusetts buffer-zone statute that prohibited standing on a "public way or sidewalk within 35 feet of an entrance or driveway" of an abortion clinic. McCullen, 134 S. Ct. at 2525. After a bench trial on stipulated facts, the district court upheld the statute, and the First Circuit affirmed. The Supreme Court

11

applied intermediate scrutiny – the same standard we apply in this case – and reversed.

As to whether the statute furthered a significant governmental interest, the Court referred to prior case law recognizing the legitimacy of the government's interests in public safety and the unobstructed use of roadways and sidewalks and then stated, without reference to any evidence presented at trial, that "[t]he buffer zones clearly serve these interests." Id. at 2535. The Court nonetheless held that the statute was not narrowly tailored because it burdened substantially more speech than necessary to serve those interests. In rejecting the Commonwealth's narrow-tailoring arguments, the Court repeatedly grounded its conclusions on the absence of evidence supporting the Commonwealth's arguments. See id. at 2539 ("Respondents point us to no evidence that individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access."); id. (rejecting State's argument that enforcing existing laws would not prevent the safety and congestion problems addressed by the statute because the Commonwealth did not identify "a single prosecution brought under those laws within at least the last 17 years" and therefore "has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it"); id. at 2540 ("Given the vital First Amendment interests at

12

stake, it is not enough for Massachusetts simply to say that other approaches have not worked.").

We draw several lessons from the Court's decision in McCullen. First, the Court's discussion of whether the statute furthered an important governmental interest confirms that the existence of a governmental interest may be established by reference to case law. See id. at 2535. Second, the Court's flat declaration that "[t]he buffer zones clearly serve these interests," id., indicates that objective evidence is not always required to show that a speech restriction furthers the government's interests.[4] Finally, the Court's rejection of the Commonwealth's narrow-tailoring arguments makes it clear that intermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden. With these principles in

_____

[4] In McCullen, the relationship between the government's asserted interest and the challenged statute was obvious -- the Commonwealth was concerned about congestion around abortion clinics obstructing traffic and preventing access to the clinics, and the statute prohibited people from gathering in roadways around abortion clinics. In cases where the relationship is not so obvious, we do not believe that McCullen would relieve the government of its obligation to present evidence showing that the speech regulation furthers its asserted interests.

13

mind, we turn now to Reynolds' substantive challenges to the Amended Ordinance.

IV.

Reynolds argues the County failed to prove that the Amended Ordinance is narrowly tailored to serve a significant governmental interest.

A.

The County contends that the solicitation activities that the Amended Ordinance prohibits can obstruct traffic and are dangerous to drivers and solicitors alike, and that the Amended Ordinance furthers the County's interests in safety and unobstructed use of its highways. Reynolds does not dispute that the County's asserted interests are legitimate and substantial. See McCullen, 134 S. Ct. at 2535 (recognizing "the legitimacy of the government's interests in ensuring public safety and order [and] promoting the free flow of traffic on streets" (internal quotation marks omitted)); Brown v. Town of Cary, 706 F.3d 294, 305 (4th Cir. 2013) ("It is beyond dispute that the Town's stated interests in promoting aesthetics and traffic safety are substantial."). Instead, Reynolds contends that the County's evidence was insufficient to establish that the roadway-solicitation prohibited by the Amended Ordinance is dangerous or that the Amended Ordinance actually furthers the County's asserted interests. We disagree.

14

Under intermediate scrutiny, the County is required to demonstrate that the Amended Ordinance "materially advances an important or substantial interest by redressing past harms or preventing future ones." Ross, 746 F.3d at 556 (internal quotation marks omitted). Chief Middleton testified about the increasing number of people soliciting contributions from intersections, "many" of which are very busy, J.A. 102, and he described potential dangers associated with that activity, see J.A. 105 (noting that roadway solicitors might "misjudge the traffic and step out in front of a car" and that an inattentive driver might "run up onto the curb"). Even without evidence of injuries or accidents involving roadway solicitors, we believe the County's evidence, particularly when it is considered along with a healthy dose of common sense, is sufficient to establish that roadway solicitation is generally dangerous. See Ross, 746 F.3d at 556 (explaining that the government "is entitled to advance its interests by arguments based on appeals to common sense and logic" (internal quotation marks omitted)).

And once we accept that roadway solicitation is dangerous, then it is apparent that the Amended Ordinance furthers the County's safety interests. Indeed, we believe it is as obvious that the Amended Ordinance furthers the County's safety interests as it was obvious that the statute in McCullen furthered Massachusetts' safety interests, as both move

15

pedestrians out of roadways and away from traffic. While the record in this case does not establish how many people solicit from the roadways or how many use the roadways for purposes permitted by the Amended Ordinance, it does establish that roadway solicitors had increased to a number sufficient to worry a law-enforcement officer with 40 years' experience and to prompt hundreds of citizen complaints. Under these circumstances, common sense and logic compel the conclusion that by removing solicitors from County roadways, the Amended Ordinance reduces the number of people engaging in a dangerous activity and thus furthers the County's safety interest in a direct and material way.

B.

In addition to furthering a significant governmental interest, a narrowly tailored regulation "must not burden substantially more speech than is necessary to further the government's legitimate interests." McCullen, 134 S. Ct. at 2535 (internal quotation marks omitted). As noted, the regulation need not be the least restrictive means available, "[b]ut the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Id. (internal quotation marks omitted).

16

Reynolds contends that if the County has established any safety interest at all, that interest is limited to particularly busy intersections, where Chief Middleton's concerns were focused. See J.A. 101 ("I think any time you have individuals in an intersection, particularly busy intersections, that there's a public safety concern."); J.A. 102 ("[W]ith traffic as busy as it is in many of these intersections, and the volume that was there, I was as concerned for the individuals that were soliciting as I was for the drivers."). Reynolds thus argues that the Amended Ordinance burdens more speech than necessary because it bans solicitation not just on the busiest or most dangerous roads and intersections, but on all roadways and medians in the County, without regard to whether solicitation could be safely conducted there. See Weinberg v. City of Chicago, 310 F.3d 1029, 1040 (7th Cir. 2002) ("The concerns behind . . . the ordinance were to alleviate sidewalk congestion [around the United Center]. . . . [W]e cannot see how this can justify a restriction which prevents a peddler from selling his wares in large parking lots, less congested walkways, or sidewalks in less proximity to the United Center.").

Reynolds also contends that the Amended Ordinance burdens more speech than necessary because the County has other, less restrictive means available to further its asserted interest. According to Reynolds, the County could achieve its safety

interest by enforcing existing traffic laws -- such as those governing jaywalking, obstructing traffic, loitering, and the like -- against any roadway solicitors who in fact obstruct traffic or otherwise cause problems. The County presented no evidence demonstrating why these alternatives would not serve its safety interest as effectively as the Amended Ordinance, and Reynolds therefore argues that the district court erred in finding the Amended Ordinance narrowly tailored.

Preliminarily, we note that the Amended Ordinance burdens a wide range of protected speech. See Watchtower Bible & Tract Soc. of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 165 (2002) (explaining that courts must consider "the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve"). The Amended Ordinance prohibits all forms of leafletting, which is one of the most important forms of political speech, see McCullen, 134 S. Ct. at 2536 ("[H]anding out leaflets in the advocacy of a politically controversial viewpoint is the essence of First Amendment expression; no form of speech is entitled to greater constitutional protection." (internal quotation marks and alteration omitted)), as well as soliciting any kind of contribution, whether political or charitable, or selling or attempting to sell goods or services. All of this speech is

18

constitutionally protected, and it is all prohibited. Indeed, the only thing the Amended Ordinance prohibits is speech; no portion of it is addressed to pure conduct, such as blocking traffic.

Despite the broad swath of speech prohibited by the Amended Ordinance, the County insists the Amended Ordinance is narrowly tailored because it prohibits only the most dangerous kind of roadway speech – "transactional" speech that "necessarily invites physical interaction between pedestrians and motor vehicles." Brief of Respondent at 34. The County thus asserts that the Amended Ordinance does not burden more speech than necessary "because it only eliminates the precise problem identified by the County – the disruption caused by transactional speech in the middle of the highway." Id. In the County's view, the dangers of roadway solicitation are the same on busy roads and quiet back roads. Because the danger is present on all roads, the County contends that it is appropriate for the Amended Ordinance to apply to all county roads.

While the County's arguments are not without some appeal, they are essentially the same arguments made in McCullen, and they fail here for the same reason they failed in McCullen – lack of evidentiary support. The Amended Ordinance applies to all County roads, regardless of location or traffic volume, and includes all medians, even wide medians and those beside traffic

19

lights and stop signs. The Ordinance thus prohibits <u>all</u> roadside leafletting and solicitation, even where those activities would not be dangerous. The County's evidence, however, established, at most, a problem with roadway solicitation at busy intersections in the west end of the county. Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance burdens more speech than necessary, just as the statute in <u>McCullen</u> -- a statewide statute aimed at a problem in one location -- burdened more speech than necessary. <u>See</u> <u>McCullen</u>, 134 S. Ct. at 2539 ("Respondents point us to no evidence that individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access. For a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution.").

The County also asserts that the Amended Ordinance is narrowly tailored because other, less speech-restrictive methods – specifically, the prior versions of the Ordinance – were ineffective to control the problem. As to the other laws identified by Reynolds, the County argues those laws "are no substitute for the direct fit of the [Amended] Ordinance. Solicitors are not loitering, and those camped out in medians

20

are not jaywalking, and yet they may still cause the disruption identified by the County."  Brief of Respondent at 42.

As the Court explained in McCullen, however, the burden of proving narrow tailoring requires the County to prove that it actually tried other methods to address the problem.  "Given the vital First Amendment interests at stake, it is not enough for [the government] simply to say that other approaches have not worked."  McCullen, 134 S. Ct. at 2540.  Instead, the government must "show[] that it seriously undertook to address the problem with less intrusive tools readily available to it," id. at 2539 (emphasis added), and must "demonstrate that [such] alternative measures . . . would fail to achieve the government's interests, not simply that the chosen route is easier," id. at 2540 (emphasis added).  In this case, the County simply presented no evidence showing that it ever tried to use the available alternatives to address its safety concerns.  That is, there is no evidence that the County ever tried to improve safety by prosecuting any roadway solicitors who actually obstructed traffic, or that it ever even considered prohibiting roadway solicitation only at those locations where it could not be done safely.  Without such evidence, the County cannot carry its burden of demonstrating that the Amended Ordinance is narrowly tailored.  See id. at 2539 (rejecting State's argument that enforcing existing laws would not prevent the safety and

21

congestion problems addressed by the buffer-zone law because the State did not identify "a single prosecution brought under those laws within at least the last 17 years"). The district court therefore erred by finding County's evidence sufficient to show narrow tailoring.

V.

Although we have concluded that the County's evidence failed to establish that the Amended Ordinance was narrowly tailored, we believe the proper course is to vacate and remand. Our analysis in this case was driven by the Supreme Court's decision in McCullen, which was issued after the district court's ruling in this case. As we have explained, McCullen clarified the law governing the evidentiary showing required of a governmental entity seeking to uphold a speech restriction under intermediate scrutiny. Because the parties did not have McCullen's guidance at the time they prepared their cross-motions for summary judgment, we believe the County should have an opportunity to gather and present evidence sufficient to satisfy McCullen's standard. Accordingly, we hereby vacate the district court's order granting summary judgment to the County

22

and remand for further factual development and additional proceedings as may be required.[5]

VACATED AND REMANDED

[5] Because the evidence does not establish that the Amended Ordinance is narrowly tailored, we are not required to consider whether the Ordinance leaves open ample alternate channels of communication. See McCullen v. Coakley, 134 S. Ct. 2518, 2540 n.9 (2014). Nonetheless, because the issue will likely arise on remand, we briefly address it.

The "available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech." Ross v. Early, 746 F.3d 546, 559 (4th Cir.), cert. denied, 135 S. Ct. 183 (2014). Nonetheless, the alternatives must be adequate. See Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984) ("While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." (citation omitted)). The district court noted that the Amended Ordinance permits leafletting and solicitation on sidewalks and along the side of the street and concluded that these alternatives were sufficient as a matter of law. As indicated in his verified complaint, however, Reynolds' target audience is drivers, and medians offer the most effective way to reach drivers. As Reynolds explains, "medians – which are isolated from other pedestrians, parked cars, and other obstacles that limit visibility, and which can be seen by vehicles in two-way traffic – offer unique benefits to speakers seeking to disseminate their views." Brief of Appellant at 50. While there is no question that alternative channels of communication exist, Reynolds' evidence raises a question of fact about the adequacy of those alternatives. See Weinberg v. City of Chicago, 310 F.3d 1029, 1041 (7th Cir. 2002) ("[T]he simple fact that Weinberg is permitted to communicate his message elsewhere does not end our analysis if the intended message is rendered useless or is seriously burdened."). Because there are genuine questions of material fact, summary judgment was inappropriate.