Affirmed by published opinion. Judge THACKER wrote the opinion, in which Judge KEENAN joined. Judge WYNN wrote a dissenting opinion.
THACKER, Circuit Judge:
Appellant Aaron Ross (“Appellant”) brought this action challenging his March 12, 2008 and March 25, 2009 arrests for refusing to obey Baltimore City Police Officer Wayne Early’s (“Officer Early”) repeated orders to confine his leafleting to the area designated for protest activities outside the First Mariner Arena (the “Arena”) in Baltimore, Maryland. The designated protest area was defined by a written policy (the “Policy”) of the Mayor and City Council of Baltimore (collectively, the “City”) and the Baltimore City Police Department (“BCPD”). Appellant claims the Policy is facially unconstitutional as an invalid time, place, and manner restriction on First Amendment activity, and that Officer Early violated his state and federal rights. The district court granted summary judgment against Appellant on all claims. We hold, as did the district court, that the Policy is facially valid under the First Amendment as a reasonable time, place, and manner restriction, and we find no reversible error as to Appellant’s remaining claims. Accordingly, we affirm.
I.
A.
The Arena is a large sports and entertainment venue located in downtown Baltimore. Due to its central location and the thirteen Mass Transit Administration (“MTA”) bus routes that discharge passengers in the area, the sidewalks and streets adjacent to the Arena, i.e., West Baltimore Street, Hopkins Place, West Lombard Street, and South Howard Street, regularly experience heavy pedestrian and automotive traffic. This is particularly so between 6:30 and 7:30 p.m. on weekdays, when approximately 50 MTA buses make stops on the surrounding streets.
Once a year, the City leases the Arena to Feld Entertainment for performances of the Ringling Brothers Barnum and Bailey Circus (the “Circus”). These performances, ordinarily held in late March, attract large crowds. Between seven and ten thousand patrons attend the 7:30 p.m. weekday shows, and putative attendees begin to gather outside of the Arena’s main entrance, located on the corner of West Baltimore Street and Hopkins Place, at 6:00 p.m. The performances also draw a number of animal welfare activists, such as Appellant, who object to the Circus’s treatment of animals. During the Circus’s run, these annual demonstrators engage in various protest activities, including sign-hold *550 ing, chanting, and leafleting, on the sidewalks contiguous to the Arena. Prior to 2004, the City had no official policy restricting the demonstrators’ access to the relevant streets.[1]
On March 12, 2003, the City, on the recommendation of Linda Barclay (“Barclay”), then Chief of the Legal Counsel Division in the City’s Law Department, issued a permit to People for the Ethical Treatment of Animals (“PETA”) to park a media truck on the West Baltimore side of the Arena prior to that night’s Circus performance. Although PETA complied with the terms of its permit, the position of the truck seriously obstructed the flow of traffic and caused several MTA buses to double park. Bus passengers and circus patrons overflowed from the sidewalk into the street, and BCPD and MTA officers were called to the scene to sort out the stalled traffic pattern and disperse the crowd.
Subsequent to this incident, Officer Early and at least one other BCPD officer sought advice from Barclay as to constitutionally permissible ways for BCPD to manage the potential disruption to pedestrian and automotive traffic caused by protesters during Circus performances. In response to this request, on March 10, 2004, Barclay issued the Policy, an e-mail to various City and BPCD personnel, setting forth certain limitations on the location of sidewalk demonstrators prior to Circus performances.[2] Noting the implementation of this plan had “worked well,” the Law Department has since reissued the Policy by e-mail, with minor revisions, for each year of the Circus. J.A. 197-199. As last revised in 2006, the Policy provides:
1. East Side of the Arena (Hopkins Place) — Any protestors will be asked to move to the sidewalk between the Arena and Hopkins Place. This will help alleviate any congestion problems at the main entrance.[3]
2. North Side of the Arena ([West] Baltimore Street) — Any protestors will be directed to stay within the brick area of the sidewalk, approximately 13 feet wide between the curb and the middle of the sidewalk. This provides the remainder closer to the building for foot traffic to access Baltimore Street and main entrances.
3. West Side of Arena (Howard Street) — Any protestors will be asked to remain on the corner of Howard and Baltimore Streets or to move to the middle of the block south of the Howard Street entrance. This will allow sufficient room for attendees to access the Arena from the Howard Street entrance.
Id. The Policy further directs police officers to issue at least two verbal warnings prior to making any arrest for failure to obey a lawful order. See id.; see also Md.Code Ann., Crim. Law § 10 — 201(c)(3) (a person who “willfully fail[s] to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace” is guilty of a misdemeanor).
On March 12, 2008, and March 25, 2009, Appellant was leafleting within the prohib *551 ited area outside the Arena’s West Baltimore Street entrance. On each occasion, Officer Early repeatedly warned Appellant to move to the designated area and, when he refused, arrested him for failing to obey a lawful order. Appellant subsequently filed suit, alleging common law and constitutional torts against Officer Early as well as claims pursuant to 42 U.S.C. § 1983 against the City, BCPD, and other government officials for violating his First and Fourth Amendment rights.
B.
The lengthy procedural history of this case is thoroughly discussed in the district court’s two published opinions, Ross v. Early, 758 F.Supp.2d 313 (D.Md.2010) (“Ross I ”) and Ross v. Early, 899 F.Supp.2d 415 (D.Md.2012) (“Ross II”), and we limit ourselves to summarizing the relevant portions of the orders currently on appeal.
On December 8, 2010, the district court denied the parties’ cross-motions for summary judgment on Appellant’s facial challenge to the Policy. See Ross I, 758 F.Supp.2d at 319-25. Specifically, the court determined the level of scrutiny applicable to the Policy turned on a disputed question of material fact, i.e., whether the Policy “was of general application,” like an ordinance, or “specifically targeted to circus and animal welfare protestors,” like an injunction. Id. at 323. The court reasoned that, if the Policy was an ordinance-like restriction on speech, intermediate scrutiny would apply and the Policy would be upheld. Id. at 323-25; see Ward v. Rock Against Racism, 491 U.S. 781, 798-99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (for purposes of intermediate scrutiny, a time, place, and manner restriction on speech is narrowly tailored “ ‘so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation,’ ” and it need not be “the least restrictive or least intrusive means” of serving the government’s significant interests (citation omitted)). If, however, the Policy was an injunction-like restriction on speech, heightened scrutiny would apply and the Policy would fail. Ross I, 758 F.Supp.2d at 323-25; see Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (for purposes of heightened scrutiny, a time, place, and manner restriction in the form of an injunction is only narrowly tailored if “the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest”). The ultimate resolution of this question, the court ruled, was a matter for the jury. Ross I, 758 F.Supp.2d at 323.
Thereafter, on September 25, 2012, the court granted Officer Early’s motion for summary judgment as to the claims against him in his individual capacity. See Ross II, 899 F.Supp.2d at 425-32. With respect to Appellant’s claims that Officer Early violated his First and Fourth Amendment rights under 42 U.S.C. § 1983, the court concluded that, irrespective of the Policy’s constitutionality, Officer Early was entitled to qualified immunity because he had not violated any of Appellant’s “clearly established” constitutional rights. Id. at 428-29. As for Appellant’s state law claims for false arrest and false imprisonment, the court concluded that Appellant had failed to demonstrate the absence of legal justification for his arrest and detention, a necessary predicate for sustaining such claims. Id. at 430-31.
Faced with an imminent jury trial that would determine the level of scrutiny applicable to the Policy, the parties entered into a stipulation agreeing the Policy “was generally applicable toward all expressive activity” and “was not targeted ... toward *552 restricting the activities of circus and animal welfare street protesters specifically.” J.A. 156. With the only remaining factual dispute thus resolved, the district court, consistent with its prior orders, determined that intermediate scrutiny was the proper standard against which to measure Appellant’s facial challenge. It thus entered judgment in favor of the City and BCPD, upholding the Policy as a reasonable time, place, and manner restriction on protected speech. See id. at 58.
On appeal, Appellant accepts intermediate scrutiny as the applicable standard of review and challenges only the district court’s determination that, under that standard, the Policy is facially constitutional as a reasonable time, place, and manner restriction on speech. He further challenges the district court’s grant of qualified immunity to Officer Early and its dismissal of his state law claims in Ross II.
II.
We review a district court order granting summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. See Lansdowne on the Potomac Homeowners Ass’n, Inc. v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 195 (4th Cir.2013). The City bears the burden of showing the Policy satisfies the applicable level of scrutiny. See Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).
III.
We first address Appellant’s facial challenge to the Policy as an improper time, place, and manner restriction on protected speech. Applying intermediate scrutiny, we conclude the Policy is facially valid under the First Amendment.
A.
We apply the time, place, and manner doctrine to determine whether restrictions placed on protected speech in public fora violate the First Amendment. See Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); Clatterbuck v. City of Charlottes-ville, 708 F.3d 549, 555 (4th Cir.2013). Here, it is undisputed that the Policy regulates protected speech, applies to public sidewalks that serve as traditional public fora, and is content-neutral in that it may be “justified without reference to the content of the regulated speech.” Clark v. Cmty. for Creative Noru-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Consequently, the Policy will be upheld if it is “ ‘narrowly tailored to serve a significant governmental interest, and ... leave[s] open ample alternative channels for communication of the information.’ ” Ward, 491 U.S. at 791, 109 S.Ct. 2746 (quoting Clark, 468 U.S. at 293, 104 S.Ct. 3065).
Before undertaking this analysis, however, we must determine the appropriate scope of our narrow tailoring inquiry. Our dissenting colleague would reject the intermediate standard articulated in Ward in favor of the heightened requirements set forth in Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). We look to both Ward and Madsen to guide our inquiry.
Under Ward and its progeny, a content-neutral regulation directed at the time, place, or manner of protected speech is ordinarily subject to intermediate scrutiny. See Ward, 491 U.S. at 791, 109 S.Ct. 2746. A regulation is narrowly tailored under this standard if it “ ‘promotes a substantial government interest that would be achieved less effectively absent the regulation’ ” and does not “burden substantially more speech than is necessary to further *553 the government’s legitimate interests.” Id. at 799, 109 S.Ct. 2746 (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). In this vein, the regulation need not be “the least restrictive or least intrusive means” of serving the government’s significant interests. Id. at 798-99,109 S.Ct. 2746.
Where such a regulation takes the form of a court-issued injunction, however, the Supreme Court has determined that the “standard time, place, and manner analysis” set forth in Ward “is not sufficiently rigorous.” Madsen, 512 U.S. at 765, 114 S.Ct. 2516. Noting that “generally applicable statute[s]” are inexorably analyzed under Ward, the Court identified three “obvious differences” between ordinances and court-ordered injunctions that, in its view, compelled a heightened tailoring standard for the latter. 512 U.S. at 764, 114 S.Ct. 2516. First, “[ojrdinances represent a legislative choice regarding the promotion of particular societal interests,” while injunctions “are remedies imposed for violations (or threatened violations) of a legislative or judicial decree.” Id. at 764, 114 S.Ct. 2516 (citation omitted). Second, injunctions bind only the parties in a particular case, not the public at large, and thus “carry greater risks of censorship and discriminatory application than do general ordinances.” Id. Third, injunctions are only warranted when the party to be enjoined has engaged or threatened to engage in impermissible activity, and as such, injunctions “can be tailored by a trial judge to afford more precise relief than a statute[J” Id. at 765, 114 S.Ct. 2516 (citation omitted). These differences, the Court reasoned, call for a “somewhat more stringent” application of the narrow tailoring test in the injunction context. Id. It thus adopted a heightened scrutiny standard, requiring that “the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest.” Id. (citation omitted).
In the dissent’s view, Ward and Madsen present a binary choice that must be resolved at the forefront of any litigation involving restrictions that are neither generally applicable statutes nor injunctions. The reviewing court, in other words, is charged with “conduct[ing] a fact-intensive inquiry to determine whether the restriction is more like an ordinance or more like an injunction” prior to selecting the appropriate level of scrutiny. Post at 551-52. Extrapolating from this principle, the dissent posits that the Policy more closely resembles an injunction than an ordinance because it (1) involved no legislative choice and (2) is not publicly available. See id. at 553-54. Thus, the dissent concludes, heightened scrutiny must apply.
The dissent’s threshold premise, although well-reasoned, stands on uncertain legal ground. Our court has not yet expanded Madsen’s rationale beyond the borders of court-issued injunctions. Indeed, the Third Circuit is, to date, the only appellate court to have explicitly done so. See McTeman v. City of York, 564 F.3d 636, 654-55 (3d Cir.2009) (applying heightened scrutiny to a targeted and ad hoc “police directive, issued by officers in the field”); see also Huminski v. Corsanes, 386 F.3d 116, 155 (2d Cir.2004) (citing Madsen with approval in analyzing the reasonableness of a targeted government restriction, issued by court security personnel to a single protester, in a nonpublic forum). In contrast, the overwhelming majority of our sister circuits have, post-Madsen, simply continued to analyze a wide variety of non-legislative governmental action, neither ordinance nor injunction, under intermediate scrutiny. See, e.g., Marcavage v. City of N.Y., 689 F.3d 98, 101, 106 (2d Cir.2012) (policy instituted by *554 police); Milestone v. City of Monroe, Wis., 665 F.3d 774, 782-84 (7th Cir.2011) (city policy in the form of a senior center’s code of conduct); Marcavage v. City of Chicago, 659 F.3d 626, 630-31 (7th Cir.2011) (ad hoc oral police directives issued by officers in the field); Saieg v. City of Dearborn, 641 F.3d 727, 730-31, 738-39 (6th Cir.2011) (policy instituted by police); Faustin v. City and Cnty. of Denver, Colo., 423 F.3d 1192, 1196-97, 1200-01 (10th Cir.2005) (unwritten city policy); Menotti v. City of Seattle, 409 F.3d 1113, 1124-25, 1131-37 (9th Cir.2005) (executive order issued during civil emergency); Hobbs v. County of Westchester, 397 F.3d 133, 148-50 (2d Cir. 2005) (county policy in the form of an executive order); Potts v. City of Lafayette, Ind., 121 F.3d 1106, 1109, 1111-12 (7th Cir.1997) (“operations order” drafted by police captain); Int’l Caucus of Labor Cornrns. v. City of Montgomery, 111 F.3d 1548, 1550, 1551-52 (11th Cir.1997) (city policy “in the form of a letter from the City Attorney”).
The dissent distinguishes these cases on the grounds that they involve “legislative delegation[s] of policymaking authority,” “one-of-a-kind security situation[s],” or “obvious actual notice of the speech restriction.” Post at 553-54. The import of these purported distinctions is less than clear. Regardless of how these cases are categorized, they demonstrate that Mad-sen has rarely come into play outside of the injunction context, even in the limited universe of non-legislative actions. Indeed, to the extent these distinctions are even relevant, we observe that the instant case falls squarely within the dissent’s “obvious and actual notice” category — in addition to the fact that the Policy has been publicly enforced since 2004, the videos of Appellant’s arrests demonstrate that the police officers repeatedly advised the protestors (1) where they were permitted to demonstrate; (2) that the City had a “law” proscribing expressive activities to certain defined areas; and (3) that they should call the Law Department if they wanted more information. Cf Faustin, 423 F.3d at 1195 (police officers asked protestor to leave and/or remove her banner pursuant to unwritten city policy); Int’l Caucus of Labor Comms., Ill F.3d at 1549 (police officers repeatedly ordered a group to cease distributing literature from tables, the group wrote a letter to the city, and the city replied by detailing its unwritten policy banning such tables); Potts, 121 F.3d at 1107 (policy banning “weapons” posted on signs at rally entry point).
In any event, we need not definitely resolve this issue for the purposes of this appeal. Critically, the parties have stipulated that the Policy is “generally applicable” and not “targeted ... toward restricting the activities of circus and animal welfare street protestors specifically.” J.A. 156. As set forth in detail by the district court, the injunction-specific concerns warranting heightened scrutiny identified in Madsen are largely inapposite in the context of generally applicable municipal policies. See, e.g., Madsen, 512 U.S. at 764, 114 S.Ct. 2516 (“‘[Tjhere is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.’ ” (quoting Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 112-13, 69 S.Ct. 463, 93 L.Ed. 533 (1949))). Consequently, even if we were to accept the dissent’s initial premise, we would nonetheless conclude the Policy is not subject to heightened scrutiny.
Although we share the dissent’s concerns with respect to the Policy’s non-legislative origins, we do not find these concerns to be dispositive. The Policy may not represent “a legislative choice,” *555 Madsen, 512 U.S. at 764, 114 S.Ct. 2516, but this fact, standing alone, does not create an injunction-like restriction on speech. See, e.g., ante at 553-54. Similarly, the remainder of the dissent’s concerns — the procedures surrounding the Policy’s promulgation and distribution, its allegedly “secret” nature — are more like bygone due process and vagueness challenges than reasons to apply heightened scrutiny. We should not rush to declare a new rule of constitutional law simply because we would have preferred that Appellant plead a different case.[4]
In short, the parties have stipulated to a set of facts warranting the application of intermediate scrutiny, and it is under that rubric we proceed. We must thus determine whether, under the principles set forth in Ward, the Policy is “‘narrowly tailored to serve a significant governmental interest, and ... leave[s] open ample alternative channels for communication of the information.’” 491 U.S. at 791, 109 S.Ct. 2746 (quoting Clark, 468 U.S. at 293, 104 S.Ct. 3065).
1.
We begin by addressing whether the Policy is “ ‘narrowly tailored to serve a significant governmental interest[.]’ ” Ward, 491 U.S. at 791, 109 S.Ct. 2746 (quoting Clark, 468 U.S. at 293, 104 S.Ct. 3065). A regulation is narrowly tailored if it (a) “ ‘promotes a substantial government interest that would be achieved less effectively absent the regulation,’ ” and (b) does not “burden substantially more speech than is necessary to further the government’s legitimate interests.” Id. at 799, 109 S.Ct. 2746 (citation omitted). We consider each of these elements in turn.
a.
In order to meet its burden under the first prong of the narrow tailoring requirement, the City must demonstrate that the Policy “‘promotes a substantial government interest that would be achieved less effectively absent the regulation.’” Ward, 491 U.S. at 799, 109 S.Ct. 2746 (citation omitted). The City’s express purpose in creating the Policy was to reasonably accommodate both circus protesters and circus attendees while ensuring protesters “(a) do not block pedestrian movement; (b) do not block entrances, exits or handicapped ramps; and (c) do not otherwise create a public safety hazard.” J.A. 167.
Our jurisprudence makes clear that a city’s interest “ ‘in maintaining the safety, order, and accessibility of its streets and sidewalks’ ” is sufficient to justify a time, place, and manner regulation. Green v. City Of Raleigh, 523 F.3d 293, 301 (4th Cir.2008) (quoting Cox v. City of Charleston, 416 F.3d 281, 284 (4th Cir.2005)). Indeed, as described by the Supreme Court, “municipal authorities, as trustees for the public, have the duty to keep their communities’ streets open and available for the movement of people and property, the primary purpose to which the streets are dedicated.” Schneider v. State of N.J., 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939). On this strength of authority, we have little trouble concluding the City’s asserted interest in maintaining the flow of pedestrian traffic and ensuring public safety qualifies as “substantial.”
*556 This conclusion does not end our inquiry, however, as it is not enough for the City to identify an interest that is significant in the abstract. See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (“That the Government’s asserted interests are important in the abstract does not mean, however, that the [challenged law] will in fact advance those interests.”).[5] Rather, the City must demonstrate the Policy “materially advances an important or substantial interest by redressing past harms or preventing future ones.” Satellite Broad. & Commc’ns Ass’n v. FCC, 275 F.3d 337, 356 (4th Cir.2001). Although we do not require the government to present a panoply of empirical evidence in order to satisfy this standard, cf. United States v. Carter, 669 F.3d 411, 418 (4th Cir.2012) (“[T]he Constitution does not mandate a specific method by which the government must satisfy its burden under heightened judicial scrutiny.”), it must nonetheless make some evidentiary showing that the recited harms are “ ‘real, not merely conjectural,’ ” and that the Policy “ ‘alleviate[s] these harms in a direct and material way.’” Satellite Broad., 275 F.3d at 356 (quoting Turner, 512 U.S. at 664, 114 S.Ct. 2445); see also Marcavage, 689 F.3d at 105 (where the government interest involves reducing a risk to public safety, it must show “the risk ... is substantial and real instead of merely symbolic” (internal quotation marks and citation omitted)).
With these principles in mind, we are satisfied the City has adequately demonstrated that the presence of protestors on the relevant sidewalks presents a plausible threat to the orderly flow of pedestrian traffic and, concomitantly, public safety. In reaching this conclusion, we emphasize that the City is “entitled to advance its interests by arguments based on appeals to common sense and logic,” Multimedia Publ’g Co. of S. Carolina, Inc. v. Green-ville-Spartanburg Airport, 991 F.2d 154, 160 (4th Cir.1993), particularly where, as here, the burden on speech is relatively small. See Bl(a)ck Tea Soc’y v. City Of Boston, 378 F.3d 8, 14 (1st Cir.2004) (“[H]eavier burdens on speech must, in general, be justified by more cogent evi-dentiary predicates.”).
The undisputed evidence reveals that the sidewalks surrounding the Arena suffer from severe congestion during performances of the Circus and that, at least once' — -in the year preceding the issuance of the Policy — the presence of protestors caused a significant safety hazard. Inasmuch as the Policy carves out a passageway dedicated to pedestrian movement, it materially reduces the risks the City intends to prevent. The Policy thus promotes the City’s significant interest in a manner “ ‘that would be achieved less effectively absent the regulation.’ ” Ward, 491 U.S. at 799, 109 S.Ct. 2746 (citation omitted).[6]
*557 b.
Next, we must ask whether the Policy “burden[s] substantially more speech than is necessary to further the government’s legitimate interests.” Ward, 491 U.S. at 799,109 S.Ct. 2746. To satisfy this standard, the City need not regulate using “the least restrictive or least intrusive means” available to achieve its goals. Id. at 798, 109 S.Ct. 2746. Put differently, “Mo long as the means chosen are not substantially broader than necessary to achieve the government’s interest ... the regulation will not be invalid simply because a court concludes that the government’s interest could be adequately served by some less-speech-restrictive alternative.” Id. at 800,109 S.Ct. 2746.
The Policy restricts the protestors to three designated areas adjacent to the Arena, i.e., the outer half of West Baltimore Street’s 29-foot sidewalk, a designated portion of Howard Street’s 15-foot sidewalk, and the sidewalk directly across from the Hopkins Place plaza. The Policy is limited in both scope and duration, setting aside dedicated channels for pedestrian traffic on the relevant streets in order to promote the safety, order, and accessibility of its sidewalks during the pendency of a heavily attended event. On its face, the Policy does no more than “target[] and eliminate[ ] ... the exact source of the ‘evil’ it seeks to remedy.” Frisby v. Schultz, 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (citation omitted).
Appellant nonetheless contends the Policy is not narrowly tailored because a number of “obvious” and “feasible” alternatives exist that would permit more speech. Appellant’s Br. 36; see City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 418 n. 13,113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (“numerous and obvious less-burdensome alternatives” are “a relevant consideration in determining whether the ‘fit’ between ends and means is reasonable”). He presents a lengthy list of proposed alternatives, ranging from “leaving things be” to implementing a system of “pro-rated” leafleting slots for individual protestors. Appellant’s Br. 36. Many of Appellant’s suggestions are vague and would require significant effort in implementation and enforcement — the “obviousness” and “feasibility” of such alternatives is subject to debate. In any event, even if such alternatives are plausible, they do not alter our conclusion that the Policy does not burden substantially more speech than necessary. See Ward, 491 U.S. at 797, 109 S.Ct. 2746 (“[Rjestrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech.” (internal quotation marks and citation omitted)).
Appellant also posits the theory that the Policy is required to have a “small group exception” exempting a small number of persons, presumably leafleters, from its purview. Appellant’s Rep. Br. 9. In support of this bold assertion, he relies on Cox, in which we held the lack of a small group exception rendered unconstitutional a city’s policy requiring a permit for any gathering on public streets or sidewalks. 416 F.3d at 285-86. Inasmuch as Cox involved an exceedingly broad prior restraint, burdened by a “heavy presumption against its constitutional validity,” Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 *558 S.Ct. 631, 9 L.Ed.2d 684 (1963), it has limited applicability to this case. Indeed, in striking down the permit requirement as facially unconstitutional for lack of a “small group” exception, Cox went on to identify a number of less restrictive means to achieve the city’s objective — including “ordinances that ‘regulate only the volume, location, or duration of [protected] expression,’ rather than subjecting all speech to a permit requirement.” 416 F.3d at 286 (citation omitted). Faced with such clearly distinguishable authority, we can find no basis for importing the “small group” exception into the standard time, place, and manner context.
For all these reasons, we conclude the Policy’s limited proscription on the locale of expressive activities is narrowly tailored to address threats to sidewalk congestion and public safety.
c.
We close our narrow tailoring discussion by addressing a concern raised by the dissent. In its view, we have neglected to address an essential element of the narrow tailoring inquiry, i.e., “whether the restriction operates ‘in such a manner that a substantial portion of the burden on speech does not serve to advance [the government’s] goals.’ ” Post at 554-55 (alteration in original) (quoting Ward, 491 U.S. at 799, 109 S.Ct. 2746). Measuring the Policy against this test, the dissent contends, reveals it to be fatally underinclusive because the “secret nature of the restrictions” undermines the City’s goals. Id. at 555.
The dissent derives its test for underin-clusiveness from the following passage in Ward:
To be sure, th[e] [narrow tailoring] standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government’s legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. So long as the means chosen are not substantially broader than necessary to achieve the government’s interest, however, the regulation will not be invalid simply because a court concludes that the government’s interest could be adequately served by some less-speech-restrictive alternative.
Ward, 491 U.S. at 799-800, 109 S.Ct. 2746 (emphasis supplied) (internal citations and footnote omitted); see also post at 554-55.[7] The emphasized passage bears no obvious relationship to the concept of underinclu-siveness. More to the point, we are aware of no authority, and the dissent has cited none, that supports its particular iteration of the narrow tailoring test. See post at 554-55.
We recognize, in any event, that the limited scope of a regulation on speech, i.e., underinclusiveness, can serve to “ ‘undermine[ ] the likelihood of a genuine [governmental] interestf.]’ ” F.C.C. v. League of Women Voters of California, 468 U.S. 364, 396, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (second alteration in original) (citation omitted). The dissent, however, has identified no such infirmity here. The crux of its theory is simply that the “secret” na *559 ture of the policy renders it constitutionally infirm. This is, in essence, a challenge to the Policy on vagueness grounds — a challenge Appellant has not made. We will not, as the dissent urges, shoehorn a wholly undeveloped and unargued vagueness claim into this case under the guise of narrow tailoring.[8]
2.
The final prong of the time, place, and manner test asks whether the Policy “ ‘leave[s] open ample alternative channels for communication of the information.’ ” Ward, 491 U.S. at 791, 109 S.Ct. 2746 (quoting Clark, 468 U.S. at 293, 104 S.Ct. 3065). In order to satisfy this standard, the available alternatives need not “be the speaker’s first or best choice” or “provide[ ] the same audience or impact for the speech.” Gresham v. Peterson, 225 F.3d 899, 906 (7th Cir.2000) (citations omitted). Rather, the relevant inquiry is simply whether the challenged regulation “provides avenues for ‘the more general dissemination of a message.’ ” Green, 523 F.3d at 305 (quoting Frisby, 487 U.S. at 482-84,108 S.Ct. 2495).
The Policy directs protestors to stand in designated areas located mere feet from their intended audience, within full view and earshot of both passersby and circus attendees, and imposes no restriction on the channels of expression employed therein. We readily conclude this narrow degree of geographical separation does not hinder the protestors’ ability to disseminate their message. See, e.g., Cmty. for Creative Non-Violence v. Turner, 893 F.2d 1387, 1393 (D.C.Cir.1990) (“In considering whether a regulation leaves open ample alternative channels of communication, the [Supreme] Court has generally upheld regulations which merely limit expressive activity to a specific part of the regulated area or to a limited time frame.”); cf. Hill v. Colorado, 530 U.S. 703, 729, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (“Signs, pictures, and voice itself can cross an 8-foot gap with ease.”).
Although Appellant does not dispute the protestors’ ability to reach their intended audience from the designated areas via “holding] sign[s],” “chantfing],” or engaging in “other form[s] of communication,” Appellant’s Br. 37, he contends the Policy fails for lack of adequate alternatives because it does not provide “ample” opportunities to distribute leaflets.[9] Our inquiry, however, does not rise or fall on the efficacy of a single medium of expression. The First Amendment affords no special protection to a speaker’s “favored or most cost-effective mode of communication,” Johnson v. City & County of Philadelphia, 665 F.3d 486, 494 (3d Cir.2011) (citation and internal quotation marks omitted), and leafleting is not an inalienable right ex *560 empted from all forms of government regulation. See McCullen v. Coakley, 571 F.3d 167, 180 (1st Cir.2009) (“[H]andbilling is not specially protected.”); Horina v. City of Granite City, 538 F.3d 624, 631 (7th Cir.2008) (“[T]he right to handbill is not absolute and federal courts have determined that governments may enact reasonable restrictions on handbilling that are also consistent with the First Amendment.” (internal citation omitted)). Appellant’s arguments to the contrary are thus unavailing.
In short, given the limited nature of the prohibition in this case, we have no doubt the designated area affords ample opportunity for protestors to communicate effectively with their intended audience, whether by leafleting, holding signs, giving speeches, or engaging in other expressive activities.
B.
Therefore, because the Policy’s limitation on speech is content neutral, narrowly tailored to achieve a substantial government interest, and allows ample alternative channels of communication, it is a permissible time, place, and manner restriction on speech. Accordingly, the district court correctly granted summary judgment as to Appellant’s First Amendment claims against the City and BCPD.
rv.
Having determined the Policy comports with the First Amendment, we need only briefly address the remaining issues on appeal. Appellant argues the district court erred in (a) granting Officer Early summary judgment on Appellant’s First and Fourth Amendment claims on the basis of qualified immunity; and (b) granting Officer Early summary judgment on Appellant’s state law claims. Finding no error, we affirm.
A.
We first decide whether the district court properly granted qualified immunity to Officer Early on Appellant’s First and Fourth Amendment claims. The qualified immunity defense “ ‘protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Bland v. Roberts, 730 F.3d 368, 391 (4th Cir.2013) (quoting Edivards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir.1999)). Consequently, “[i]n determining whether a defendant is entitled to qualified immunity, [we] must decide (1) whether the defendant has violated a constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct.” Id. (citing Walker v. Prince George’s Cnty., 575 F.3d 426, 429 (4th Cir. 2009)). Appellant’s First and Fourth amendment claims fail on the first prong of this inquiry.
1.
We begin by considering whether Officer Early violated Appellant’s First Amendment rights. On this front, Appellant contends that Officer Early is liable for viewpoint discrimination in violation of the First Amendment because he enforced the Policy only against Circus protesters. The record, however, is devoid of any evidence from which a reasonable juror could find that Officer Early arrested Appellant with a content- or viewpoint-based discriminatory purpose. See Pahls v. Thomas, 718 F.3d 1210, 1230 (10th Cir.2013) (“The Supreme Court has made clear that, for a discrimination claim rooted in the First Amendment, a plaintiff must show that a government official ‘acted with discrimina *561 tory purpose,’ ” i.e., that he acted “because of, not merely in spite of, the action’s adverse effects upon an identifiable group.” (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009))). Rather, as the district court found, “[tjhere is nothing to suggest that Officer Early ... purposely targeted [Appellant] because he was protesting the Circus.” See Ross II, 899 F.Supp.2d 415, 429 n. 16 (D.Md.2012). Thus, the district court properly granted Officer Early qualified immunity on this claim.
2.
Appellant’s Fourth Amendment claim, premised on his purportedly unlawful arrests, is similarly infirm. The circumstances of the arrests are straightforward: Officer Early repeatedly ordered Appellant to move the location of his leafleting activity in conformance with the Policy, and Appellant repeatedly refused. Ultimately, after issuing multiple warnings, Officer Early arrested Appellant — twice—■ for the misdemeanor crime of “willfully failing to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace.” Md.Code Ann., Crim. Law § 10-201(c)(3). The district court, relying on these undisputed facts, concluded that Officer Early had probable cause to effectuate the challenged arrests “sufficient to vitiate any claim of [42 U.S.C.] § 1983 liability.” Ross II, 899 F.Supp.2d at 429. We agree.
A police officer may arrest an individual without a warrant if he “has probable cause to believe that an individual has committed even a very minor criminal offence in his presence[.]” Atwater v. Lago Vista, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Probable cause exists when the facts and circumstances known to the officer are sufficient to warrant an objectively reasonable person in believing “ ‘that the suspect has committed, is committing, or is about to commit an offense.’ ” Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir.1992) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). “ Whether probable cause exists in a particular situation ... always turns on two factors in combination: the suspect’s conduct as shown to the officer, and the contours of the offense thought to be committed by that conduct.’ ” Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir.2001) (quoting Pritchett, 973 F.2d at 314).
Turning first to the “contours” of the offense in question, we observe that Md. Code Ann., Crim. Law § 10-201(c)(3) applies to offenders who “willfully fail to obey a reasonable and lawful order of a law enforcement officer, made to prevent a disturbance of the public peace.” Att’y Grievance Comm’n of Maryland v. Mahone, 435 Md. 84, 76 A.3d 1198, 1210 (2013). Under this subsection, the “ ‘failure to obey a policeman’s command to move on when not to do so may endanger the public peace, amounts to disorderly conduct’ ” in violation of Maryland law. Id. (citation omitted). This crime “is predicated on the law enforcement officer issuing a reasonable and lawful order,” Polk v. State, 378 Md. 1, 835 A.2d 575, 580 n. 3 (2003) (internal quotation marks omitted), and as such, the command “cannot be purely arbitrary and ... not calculated in any way to promote the public order.” Mahone,76 A.3d at 1211 (internal quotation marks and citation omitted).
Prior to each of the disputed arrests, Officer Early verbally ordered Appellant to move his leafleting activity to the designated area. This order was directed at enforcing the Policy, which was, in turn, directed at maintaining the safety, *562 order, and accessibility of the streets and sidewalks. Inasmuch as Appellant refused to heed these repeated requests, Officer Early had probable cause to effectuate both arrests. See Atwater, 532 U.S. at 354,121 S.Ct. 1536. Officer Early thus did not violate Appellant’s Fourth Amendment rights, and the district court correctly found him entitled to qualified immunity.[10]
B.
With respect to Appellant’s state law claims, the district court determined his claims of false arrest and false imprisonment could not be sustained because each requires a showing that Appellant was deprived of his liberty without legal justification. See Ross II, 899 F.Supp.2d at 430 n. 16. We agree with the district court’s legal premise, see Okwa v. Harper, 360 Md. 161, 757 A.2d 118, 133 (2000) (“For a successful cause of action based on false arrest or false imprisonment, the plaintiff must establish that ‘the defendant deprived him or her of his or her liberty without consent and without legal justification.’ ” (citation omitted)), and its finding that Appellant failed to make the requisite showing. We conclude, therefore, that the district court properly granted summary judgment in favor of Officer Early.
V.
For the foregoing reasons, the judgment of the district court is

AFFIRMED.

.On March 13, 2003, Peter Saar, then acting Chief Legal Counsel for the BCPD, advised Officer Early that “the entire sidewalk” was available for demonstrators. J.A. 166. Citations to the "J.A.” refer to the Joint Appendix filed by the parties in this appeal.

. The parties have stipulated that the e-mails "constitute! ] a policy of the Mayor and City Council of Baltimore and the Baltimore City Police Department!.]” J.A. 156.

. Feld Entertainment parks large trailers on the Hopkins Place plaza during the pendency of the Circus. See J.A. 214, 240.

. For similar reasons, the dissent’s concern that our ruling will provide municipal governments with the incentive to “develop and enforce speech-restrictive ‘Policies’ without having to provide even a whisper of advance notice” is overblown — the promulgation of such policies would be subject to the same due process and vagueness challenges that Appellant could have, but did not, raise here. Post at 554.

. Although Turner involved expressive conduct evaluated under the test set forth in United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), we have recognized "the O’Brien test is 'little, if any, different from the standard applied to time, place, or manner restrictions.' ” American Legion Post 7 of Durham, N.C. v. City of Durham, 239 F.3d 601, 609 n. 9 (4th Cir.2001) (quoting Clark, 468 U.S. at 298, 104 S.Ct. 3065).

. Appellant devotes much of his brief to the argument that the City’s interest is illusory because "there is nothing in the record to suggest that they were remedying an actual threat leafletting [sic] poses to a significant government interest.” Appellant's Br. 28 (emphasis supplied). Appellant misapprehends the applicable standard. The interest served by the Policy must be judged "on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government’s interests *557 in an individual case.” Ward, 491 U.S. at 801, 109 S.Ct. 2746 (emphasis supplied); see also Albertini, 472 U.S. at 688, 105 S.Ct. 2897 ("The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests.”).

. Notably, the dissent agrees with our conclusion that the Policy does not "burden substantially more speech than is necessary to further the government’s legitimate interests." Post at 555. It is difficult to reconcile how a regulation can "burden [no] more speech than necessary” to further its goals while simultaneously "regulat[ing] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.” Id.

. The fact that a few confused or disgruntled protestors actually caused some amount of pedestrian congestion by questioning the origin of the Policy does not, in any case, render the City’s rationale "a challenge to the credulous.” Republican Party of Minn. v. White, 536 U.S. 765, 780, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002); see, e.g., Nat'l Ass’n of Mfrs. v. Taylor, 582 F.3d 1, 17 (D.C.Cir.2009) (" 'Because the primary purpose of underin-clusiveness analysis is simply to ensure that the proffered state interest actually underlies the law, a rule is struck for under inclusiveness only if it cannot fairly be said to advance any genuinely substantial governmental interest, because it provides only ineffective or remote support for the asserted goals, or limited incremental support.' ” (emphasis in original) (quoting Blount v. SEC, 61 F.3d 938, 946 (D.C.Cir.1995))).

. To the extent Appellant argues the Policy is tantamount to a full-scale ban on leafleting, he mischaracterizes the record. Indeed, his own experts demonstrate that the Policy renders leafleting less effective, not foreclosed. See J.A. 283-84.

. Appellant asserts a largely identical claim for unreasonable seizure under Article 26 of Maryland’s Declaration of Rights. Inasmuch as Article 26 protects the same rights as those protected under the Fourth Amendment, see Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 360 (4th Cir.2010), this claim, too, fails upon a finding of probable cause.