**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1044**

KIMBERLY BILLUPS; MICHAEL NOLAN; MICHAEL WARFIELD,

Plaintiffs – Appellees,

v.

CITY OF CHARLESTON, South Carolina,

Defendant – Appellant.

------------------------------

CATO INSTITUTE; MORRIS M. KLEINER; EDWARD J. TIMMONS,

Amici Supporting Appellee.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  David C. Norton, District Judge.  (2:16-cv-00264-DCN)

Argued:  May 8, 2020                               Decided:  June 11, 2020

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined.

**ARGUED:**  Russell Grainger Hines, YOUNG CLEMENT RIVERS, LLP, Charleston, South Carolina, for Appellant.  Arif Panju, INSTITUTE FOR JUSTICE, Austin, Texas, for Appellees.  Eugene Volokh, UCLA SCHOOL OF LAW, Los Angeles, California, for

Amicus Cato Institute. **ON BRIEF:** Stephen L. Brown, Brian L. Quisenberry, YOUNG CLEMENT RIVERS, LLP, Charleston, South Carolina, for Appellant. Robert McNamara, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellees. Ilya Shapiro, CATO INSTITUTE, Washington, D.C., for Amicus Cato Institute. Louis Chaiten, Matthew M. Hilderbrand, JONES DAY, Cleveland, Ohio, for Amici Professors Morris M. Kleiner and Edward J. Timmons.

KING, Circuit Judge:

Kimberly Billups, Michael Nolan, and Michael Warfield (collectively, "the Plaintiffs") are current or aspiring tour guides in Charleston, South Carolina, who have faced a common obstacle — Charleston's Tour Guide Licensing Ordinance (the "Ordinance"). Pursuant thereto, before leading a paid tour through Charleston's historic districts, a prospective guide must obtain a license. And to obtain that license, a prospective guide must pass a 200-question written examination that focuses on Charleston's history, architecture, and historic preservation efforts. If a prospective guide defies the Ordinance by leading a paid tour of Charleston without a license, that person is subject to imprisonment and a fine.

To challenge the Ordinance and its mandatory licensing scheme, the Plaintiffs filed suit in the District of South Carolina against the City of Charleston (the "City"). The Plaintiffs attacked the Ordinance as an unconstitutional restriction of their First Amendment right to free speech. The district court agreed with the Plaintiffs and declared the Ordinance unconstitutional. In reaching its decision, the court assumed that the Ordinance imposes a content-neutral restriction on speech and thus applied intermediate scrutiny. The court concluded that the City has a significant interest in protecting its tourism industry, but that the Ordinance nevertheless fails intermediate scrutiny because it is not narrowly tailored to serve the City's interest. As explained below, we agree and therefore affirm.

3

I.

A.

We begin by reciting the Ordinance's history and its relevant provisions. Unquestionably, tourism drives Charleston's economy. In fact, the tourism industry generates nearly $7.37 billion in annual economic impact for the Charleston area because visitors flock to Charleston to explore its historic sites, sample its southern cuisine, and revel in its ghost stories. To help protect Charleston's tourism-based economy, the City decided to regulate the industries that serve visitors. Accordingly, the City enacted the Ordinance as part of its first Tourism Management Plan in 1983. The Ordinance prohibits unlicensed tour guides from giving paid tours on public streets throughout the historic districts of Charleston. More specifically, the Ordinance provides that no "person shall act or offer to act as a tour guide in [Charleston] for hire unless he or she has first passed a written examination and is licensed by the [C]ity's office of tourism management as a registered tour guide." *See* Code of the City of Charleston § 29-58 (2016).[1] If an individual

---

[1] The Ordinance defines several key terms relevant to its mandatory licensing scheme, including the following:

- "Tour Guide" is defined as "any person who acts or offers to act as a guide for hire through any part of the districts, including but not limited to pedestrians and persons within automobiles, motor vehicles or horse-drawn vehicles when the primary purpose of riding in such vehicles is not transportation, but touring the historic areas of the city";

(Continued)

contravenes the Ordinance by giving a tour without a license, that person faces a fine of up to $500 and a term of imprisonment not exceeding thirty days. *See id.* § 1-16(a). Importantly, however, the Ordinance does not prescribe topics that guides must discuss during tours and does not empower the City to monitor the speech of guides. In other words, once licensed, a guide may speak freely while giving tours.

The Ordinance also sets forth the process a prospective tour guide must follow to obtain a license. Under the Ordinance, to be eligible to receive a tour guide license, a prospective guide must pass a written examination, acquire a valid business license that must be renewed annually, and pay the attendant fees. The written exam contains 200 questions and is meant to "test the applicant's knowledge of [Charleston] and its history." *See* Code of the City of Charleston § 29-59(b). The Historic Charleston Foundation — a nonprofit organization that is "vitally interested in tour guides knowing [Charleston's] history" — prepares the questions for the exam, and the City adopts them without amendment. *See* J.A. 532.[2] The exam questions are drawn exclusively from a 483-page tour guide manual, which is also prepared by the Foundation and largely focuses on topics

- "Tour" and "Touring" are defined as "the conducting of or the participation in sightseeing in the districts for hire or in combination with a request for donations"; and

- "Districts" are defined as "the old and historic district and the old city district."

*See* Code of the City of Charleston § 29-2.

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

relating to Charleston's historic buildings. In the manual, the issues most likely to appear on the exam are marked with a palmetto tree. To take the exam, a prospective tour guide must pay $50; to pass the exam, that individual must answer 70% of the questions correctly. An earlier version of the Ordinance had required answering 80% of the questions correctly to pass, but the City lowered the passing score to 70% in April 2016.

After a three-year period, the tour guide license expires. If during the license term a guide completes four continuing education courses — which must be provided or approved by the City — and annually renews his business license, he is eligible to renew his tour guide license for another three-year term. If, however, a guide declines to take the continuing education courses or to annually renew his business license, he must submit a new application for a tour guide license. Such an application is treated like an initial application, which means that the applicant must, inter alia, retake the written exam. *See* Code of the City of Charleston § 29-63.[3]

B.

Having described the history and relevant provisions of the Ordinance, we now discuss the Plaintiffs. Kimberly Billups planned to establish a tour company named

---

[3] The Ordinance's examination requirement is unusual in that most other cities with tourism-based economies do not require that tour guides pass an exam to obtain a tour guide license. For example, Paula Reynolds, a tour guide organizer who has worked in over fifty jurisdictions around the United States, testified in the district court that only two other jurisdictions — New Orleans, Louisiana, and Williamsburg, Virginia — require that tour guides pass exams to obtain licenses. And after Reynolds offered that evidence, Williamsburg amended its tour guide licensing ordinance to remove the mandatory exam provision. *See* Code of the City of Williamsburg §§ 9-332, 333, 335 (2019).

6

Charleston Belle Tours. Billups intended to don an antebellum dress to portray a character — Nancy Bostick de Saussure, a longtime resident of Charleston. Once in character, Billups intended to lead visitors around town while describing Nancy and Charleston, discussing the Civil War, and telling jokes. In preparation for starting Charleston Belle Tours, Billups purchased a telephone business number, an antebellum-period costume, a credit card reader, and a website domain name.

Additionally, to comply with the Ordinance, Billups purchased the tour guide manual, paid the $50 fee to take the written examination, and studied five to six hours each day from September 2015 to November 2015. Despite her efforts, Billups answered only 70% of the exam questions correctly, which was a failing score at that time. Consequently, Billups did not receive her tour guide license until May 2016, one month after the City amended the Ordinance to reduce the passing score to 70%. According to Billups, the Ordinance's mandatory licensing scheme "greatly" affects her business, as she is "unable to hire on very knowledgeable people that have shown interest in working for [Charleston Belle Tours]." *See* J.A. 159.

Michael Nolan also wanted to lead tours in Charleston. Nolan hoped to work part-time as a tour guide and proposed a tour based on the "Irish-American experience in Charleston." *See* J.A. 297. Nolan intended to take visitors to the old Irish neighborhoods of Charleston and other historic Irish attractions. To prepare, Nolan purchased the tour guide manual and studied it for hours every day in the eight weeks preceding the written examination. Nolan mostly studied the topics marked with the "little palmetto trees." *Id.* at 299. Despite his efforts, Nolan answered only 64% of the exam questions correctly.

Because Nolan has not yet passed the exam, he does not currently have a tour guide license and cannot offer his Irish-American history tours.

Finally, Michael Warfield, an insurance broker by trade, decided that he wanted to lead pub tours in Charleston. Accordingly, in pursuit of a tour guide license, Warfield twice took the written examination. On his first try, Warfield answered 74% of the questions correctly; on his second try, he answered 68% of the questions correctly. Although both of Warfield's scores were considered failing scores when he received them, he eventually passed the exam when the City lowered the passing score to 70%.

C.

1.

As a result of their encounters with the Ordinance, the Plaintiffs filed their Complaint in the District of South Carolina on January 28, 2016. In the Complaint, the Plaintiffs sought, inter alia, a declaratory judgment stating that certain provisions of the Ordinance run afoul of the First Amendment. The Plaintiffs also requested that the court permanently enjoin the City from enforcing the Ordinance.

On February 2, 2016, the Plaintiffs asked the district court to preliminarily enjoin enforcement of the Ordinance. In support of that request, the Plaintiffs contended that they were likely to succeed on the merits of their claim that the Ordinance burdens protected speech and contravenes the First Amendment. The City opposed the Plaintiffs' preliminary injunction request and moved to dismiss the Complaint. In that regard, the City asserted that the Ordinance does not burden protected speech and does not contravene the First Amendment.

8

By its Order of July 1, 2016, the district court denied both the Plaintiffs' request for a preliminary injunction and the City's motion to dismiss. *See Billups v. City of Charleston, S.C.*, No. 2:16-cv-00264 (D.S.C. July 1, 2016), ECF No. 27 (the "Initial Order").[4] Although the Initial Order covered many topics, it is only relevant to this appeal insofar as it memorializes the court's conclusions that (1) the Ordinance burdens protected speech and is thus subject to First Amendment scrutiny, and (2) the City has a significant interest in protecting Charleston's tourism industry and visitors. As it relates to the applicability of the First Amendment, the court determined that the Ordinance burdens protected speech because "tour guide services frequently involve telling stories or providing other information about the various sites on the tour," and "there is no question that such services often act as vessels for the distribution of speech." *Id.* at 10. Put another way, the court concluded that because a tour guide's speech is his product, the Ordinance's mandate that a guide obtain a license before selling that product burdens speech and thus implicates the First Amendment.

The case subsequently proceeded through discovery and the parties thereafter filed cross-motions for summary judgment. In their motion, the Plaintiffs advanced alternative arguments regarding the unconstitutionality of the Ordinance. First, the Plaintiffs contended that the Ordinance constitutes a content-based restriction on speech subject to strict scrutiny, which it cannot survive. In the alternative, the Plaintiffs asserted that even

---

[4] The district court's Initial Order of July 1, 2016, is published at 194 F. Supp. 3d 452.

9

if the Ordinance is content-neutral, it still fails under the intermediate scrutiny standard applied to such laws because it is not narrowly tailored to serve the City's interests. In its summary judgment motion, the City maintained that the Ordinance is subject to and survives intermediate scrutiny.

The district court later conducted oral argument on the summary judgment motions, after which it denied both motions by its Order of September 25, 2017. *See Billups v. City of Charleston, S.C.*, No. 2:16-cv-00264 (D.S.C. Sept. 25, 2017), ECF No. 79 (the "Summary Judgment Order"). Consistent with the Initial Order, the court recognized the significant interest of the City in protecting Charleston's tourism industry. More specifically, the Summary Judgment Order explained that "unknowledgeable or fraudulent tour guides" pose a threat to Charleston's tourism industry, and thus the City has a significant interest in ensuring that such tour guides do not hawk subpar tour experiences. *See* Summary Judgment Order 22. Notably, the court declined to determine in the Summary Judgment Order whether to subject the Ordinance to strict or intermediate scrutiny.

2.

Following entry of the Summary Judgment Order, the district court conducted a bench trial in Charleston that began on April 9, 2018, and concluded on April 12, 2018. Because the parties largely agreed on the underlying facts, the trial evidence — comprised of witness testimony and documentary evidence — focused on the constitutionality of the Ordinance. Approximately four months after the trial, by its Order of August 3, 2018, the court memorialized its findings of fact and conclusions of law. *See Billups v. City of*

10

*Charleston, S.C.*, No. 2:16-cv-00264 (D.S.C. Aug. 3, 2018), ECF No. 115 (the "Trial Order").[5]

In the Trial Order, the district court reiterated its prior ruling — made in the Initial Order — that the Ordinance burdens protected speech and is thus subject to First Amendment scrutiny. The court then considered whether it should apply strict or intermediate scrutiny. And the answer to that question, explained the court, depends on whether the Ordinance imposes a content-neutral or content-based restriction on speech. If it is the former, the more lenient intermediate scrutiny would apply; if it is the latter, the more demanding strict scrutiny would apply. The court resolved to assume that the Ordinance imposes a content-neutral restriction on speech and thus to apply intermediate scrutiny. Because the court concluded that the Ordinance cannot survive intermediate scrutiny, it was unnecessary to consider whether the Ordinance imposes a content-based restriction on speech that would trigger strict scrutiny.

In applying intermediate scrutiny, the district court explained that the City was obliged to demonstrate that protecting Charleston's tourism industry is a significant interest, that the Ordinance is narrowly tailored to serve that interest, and that the Ordinance leaves open ample alternative channels of communication. As previously mentioned, the court had already determined in its Initial Order and its Summary Judgment Order that protecting Charleston's tourism industry constitutes a significant interest. The court thus

---

[5] The district court's Trial Order of August 3, 2018, is published at 331 F. Supp. 3d 500.

11

assessed whether the Ordinance is narrowly tailored to serve that interest. After reviewing the trial evidence, the court determined that the Ordinance is not narrowly tailored. More specifically, the court ruled that the City failed to establish narrow tailoring because it did not provide evidence that it actually tried or considered less-speech-restrictive alternatives before enacting the Ordinance, as required by our Court's decision in *Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015).

In so ruling, the district court discussed three less-speech-restrictive alternatives that the Plaintiffs identified. The Plaintiffs contended that, before enacting the Ordinance, the City should have tried to regulate tour guides using two existing ordinances, that is, the City's ordinance banning deceptive solicitations and its business licensing ordinance. Additionally, the Plaintiffs asserted that the City should have seriously considered whether it could regulate guides using a voluntary tour guide certification program similar to those used by other local governments throughout the country.

The City disagreed and maintained that the three less-speech-restrictive alternatives the Plaintiffs identified would not adequately protect its interests. To support that contention, the City offered the testimony of two officials — Daniel Riccio, the City's Director of Livability, and former Mayor Joseph Riley, Charleston's longtime leader. With respect to the deceptive solicitation ordinance — which prohibits businesses from making a "deceptive or misleading oral or written statement or representation in the course of soliciting or attempting to solicit persons" and from "misrepresent[ing] the nature of the products they are promoting," *see* Code of the City of Charleston § 21-232(a), (b) — Riccio explained that it would be "impractical from an enforcement standpoint" to regulate tour

12

guides using that ordinance because it was passed to regulate aggressive timeshare salespeople. *See* J.A. 380. Riley opined that the deceptive solicitation ordinance would be difficult to enforce because disappointed tourists would not "follow up" by submitting complaints about dishonest tour guides to the City. *Id.* at 253. Instead, said Riley, tourists would simply "go home and tell people that you get ripped off in Charleston." *Id.*

Turning to the business licensing ordinance, Riccio testified that the City cannot regulate tour guides by revoking their business licenses because a guide could avoid that sanction by starting a new company with a different name and obtaining a new business license. Additionally, Riccio and Riley testified that the City did not seriously consider a voluntary tour guide certification program before enacting the Ordinance because such a program would not be as effective as the Ordinance at protecting the City's interests. Specifically, Riccio testified that a voluntary certification program "would be impractical," *see* J.A. 378, and Riley testified that such a program would not have "the accuracy or the excellence or the quality" of the Ordinance's mandatory certification program, *id.* at 249.

The district court concluded that Riccio's and Riley's testimony was insufficient to prove narrow tailoring. Although the court acknowledged that the trial evidence showed that the City's officials *thought* less-speech-restrictive alternatives would not be as effective as the Ordinance, the court determined that such "post-hoc justification" for the Ordinance failed to satisfy the "actually tried" evidentiary standard imposed by *Reynolds*. *See* Trial Order 31 (internal quotation marks omitted). Accordingly, the court concluded that the Ordinance contravenes the First Amendment because the City failed to establish that the Ordinance is narrowly tailored to serve the City's interest in protecting

13

Charleston's tourism industry. Thereafter, on August 6, 2018, the court entered judgment for the Plaintiffs and declared the Ordinance unconstitutional.

3.

On September 4, 2018, the City filed a motion requesting that the district court amend its findings pursuant to Federal Rule of Civil Procedure 52(b) and alter or amend its judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b). The court denied that motion on December 10, 2018. On January 9, 2019, the City timely noted this appeal. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We generally review a judgment entered following a bench trial using a mixed standard of review. The district court's factual findings are reviewed for clear error and its legal conclusions are reviewed de novo. *See Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005). Nevertheless, in a free speech case, where "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," we are obliged to "make a fresh examination of crucial facts" and an "independent examination of the whole record" to ensure that there is no "forbidden intrusion on the field of free expression." *See Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 567-68 (1995) (internal quotation marks omitted).

14

III.

On appeal, the City contends that the district court committed two errors in declaring the Ordinance unconstitutional. First, the City maintains that the court wrongly concluded that the Ordinance burdens protected speech and is thus subject to First Amendment scrutiny. Second, the City asserts that even if the Ordinance is subject to First Amendment scrutiny, the court erred in determining that it does not survive intermediate scrutiny. As explained below, we reject both of the City's contentions.

A.

We begin by considering whether the Ordinance burdens protected speech and thus is subject to First Amendment scrutiny. The First Amendment guarantees that "Congress shall make no law . . . abridging the freedom of speech." *See* U.S. Const. amend. I. That bedrock constitutional protection is made applicable to the states by the Fourteenth Amendment. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). The threshold question before us is "whether any protected First Amendment right is involved." *See Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 257 (4th Cir. 2005). If no such right is involved, our First Amendment inquiry ends. *Id.* If a protected First Amendment right is involved, however, we are obliged to then assess whether the governmental action in question infringes that right. *See Am. Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 606-07 (4th Cir. 2001). It is the obligation of the Plaintiffs to prove that the Ordinance burdens protected speech. *See Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015).

15

In the City's view, the Ordinance is not subject to First Amendment scrutiny because it is a business regulation governing conduct that merely imposes an incidental burden on speech. For their part, the Plaintiffs maintain that the Ordinance directly burdens protected speech because it requires a tour guide to obtain a license before leading visitors on a paid tour through Charleston's historic districts — an activity which necessarily involves speech or expressive conduct.

We agree with the Plaintiffs. The Ordinance undoubtedly burdens protected speech, as it prohibits unlicensed tour guides from leading paid tours — in other words, speaking to visitors — on certain public sidewalks and streets. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) ("An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." (internal quotation marks omitted)); *see also Frisby v. Schultz*, 487 U.S. 474, 480-81 (1988) (explaining that public streets and sidewalks are traditional public fora, "immemorially . . . held in trust for the use of the public," where First Amendment rights are at their apex (internal quotation marks omitted)).

The City, however, resists this rather straightforward conclusion for three reasons. First, the City asserts that the Ordinance cannot constitute a burden on protected speech because tour guides who do not charge for their services can give tours without a license. But the City's profit-based distinction is quite beside the point, as speech is "protected even [when] it is carried in a form that is 'sold' for profit." *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976); *see also Sorrell*, 564 U.S. at 567 ("While the burdened speech results from an economic motive, so too does a great

16

deal of vital expression."); *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 441 (4th Cir. 1999) (explaining that "profit motive on the speaker's part does not transform" protected noncommercial speech into less-protected commercial speech).

Second, the City maintains that the Ordinance is exempt from First Amendment scrutiny because it merely regulates the commercial transaction of selling tour guide services — not the speech of the tour guides. But it is well-established that a law aimed at regulating businesses can be subject to First Amendment scrutiny even though it does not directly regulate speech. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) ("The law here may be described as directed at conduct . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message."); *see also Am. Entertainers, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 715 (4th Cir. 2018) (explaining that the First Amendment applies even if the challenged regulation "was adopted for a purpose unrelated to the suppression of expression — e.g., to regulate conduct, or the time, place, and manner in which expression may take place").

To be sure, restrictions on "protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *See Sorrell*, 564 U.S. at 567. And "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* The Ordinance, however, cannot be classified as a restriction on economic activity that incidentally burdens speech. Rather, it completely prohibits unlicensed tour guides from leading visitors on paid tours — an activity which, by its very nature, depends upon speech or expressive conduct. Although we acknowledge that the City enacted the Ordinance to protect Charleston's

17

economic well-being and safeguard its tourism industry, that alone does not shield the Ordinance from First Amendment scrutiny. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2229 (2015) ("[T]he First Amendment expressly targets the operation of the laws — *i.e.*, the 'abridg[ement] of speech' — rather than merely the motives of those who enacted them." (quoting U.S. Const. amend. I)).

Finally, the City relies on a rhetorical question in a decision from the Fifth Circuit to argue that the Ordinance does not burden protected speech. In that decision, which evaluated the constitutionality of New Orleans's mandatory licensing scheme for tour guides, the Fifth Circuit remarked: "When a city exercising its police power has a law only to serve an important governmental purpose without affecting what people say as they act consistently with that purpose, how is there any claim to be made about speech being offended?" *See Kagan v. City of New Orleans, La.*, 753 F.3d 560, 561-62 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1403 (2015). Immediately following that musing, however, the court proceeded to subject the New Orleans ordinance to First Amendment scrutiny. The *Kagan* decision thus does not support the City on the protected speech issue.

In short, the business of leading tours depends on the expression of ideas. And the Ordinance forbids unlicensed tour guides for hire from expressing those ideas on public thoroughfares. Such a restriction burdens protected speech and thus implicates the First Amendment. *Cf. Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 167 (2002) (explaining that "requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech" and effectively

bans a "significant amount of spontaneous speech"). Accordingly, we are satisfied that the Ordinance is subject to First Amendment scrutiny.

B.

Having determined that the Ordinance burdens protected speech, we now assess whether it can survive First Amendment scrutiny. To answer that question, we would usually begin by determining the applicable level of scrutiny — that is, intermediate or strict. That determination would require discerning whether the Ordinance imposes a content-neutral or content-based restriction on speech. The district court determined, however, that because the Ordinance does not survive under the more relaxed intermediate scrutiny applicable to content-neutral laws, it was unnecessary to consider whether the Ordinance might be content-based and thus subject to strict scrutiny. We are persuaded to follow the district court's approach.

Simply put, there is nothing extraordinary about declining to decide the level of scrutiny to be applied to a given law, as demonstrated by Supreme Court precedent. *See McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (declining to decide which constitutional test applied because law failed under more lenient test); *District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008) (striking down a D.C. ban on firearms after concluding that the law would fail to pass muster under "any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights"). Notably, in its decision in *McCullen v. Coakley*, the Court did decide to answer the content-neutrality question even though doing so was unnecessary. *See* 573 U.S. 464, 478 (2014). But that choice was not uncontroversial, as Justice Scalia criticized the Court for producing "seven pages of the

19

purest dicta." *Id.* at 498 (Scalia, J., concurring in the judgment). In any event, we do not read *McCullen* as establishing a hard-and-fast rule requiring that courts confront the content-neutrality question in every case. *See Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) (assuming, in a post-*McCullen* decision, the "validity of [D.C.'s] argument that [its tour guide] regulations [were] content-neutral").

Here, as discussed more thoroughly below, the Ordinance cannot survive even intermediate scrutiny. Because we therefore can resolve this appeal without deciding the content-neutrality question, we decline to rule thereon. *See Jewell Smokeless Coal Corp. v. Looney*, 892 F.2d 366, 368 (4th Cir. 1989) (declining to decide an issue because there was "another, narrower ground upon which th[e] case turn[ed]").

## C.

In applying intermediate scrutiny to the Ordinance, we follow the roadmap provided by the Supreme Court in its seminal decision in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). There, the Court explained that the government may impose "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* at 791 (internal quotation marks omitted). Because we assume that the Ordinance is content-neutral, we proceed to consider the remaining requirements. The City bears the burden of proving that the Ordinance survives intermediate scrutiny. *See Reynolds*, 779 F.3d at 226; *see also Doe v. Cooper*, 842 F.3d 833, 846 (4th Cir. 2016). Like the district court's, our analysis begins

20

and ends with the conclusion that — although the Ordinance serves the City's significant interest in protecting Charleston's tourism industry — the Ordinance is not narrowly tailored.

1.

In evaluating whether the Ordinance serves a significant governmental interest, we are guided by our decision in *Reynolds*. *See* 779 F.3d 222. As explained therein, we do not typically require governmental entities to present evidence demonstrating the existence of a significant interest. Indeed, we have found "common sense and the holdings of prior cases" sufficient to establish the existence of such an interest. *Id.* at 227. Additionally, when it is obvious that a challenged law serves a significant governmental interest, we do not require that the government produce evidence so demonstrating. *Id.* at 228 & n.4.[6]

Here, the district court concluded in its Initial Order and its Summary Judgment Order that the City has a significant interest in protecting Charleston's tourism industry from the harms potentially perpetrated by "unknowledgeable or fraudulent tour guides" peddling subpar tour experiences. *See* Summary Judgment Order 22. And the court further

---

[6] We acknowledge that our pre-*Reynolds* precedent required the government to "produce evidence [demonstrating] that a challenged regulation materially advances an important or substantial interest by redressing past harms or preventing future ones." *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 515 (4th Cir. 2002) (internal quotation marks omitted). In *Reynolds*, however, we recognized that the Supreme Court's *McCullen* decision altered that requirement, and we explained that after *McCullen* "objective evidence is not always required to show that a speech restriction furthers the government's interests." *See Reynolds*, 779 F.3d at 228. But we emphasize that *Reynolds* did not relieve the government of its evidentiary burden when the relationship between a challenged regulation and the governmental interest it allegedly furthers is not obvious. *Id.* at 228 n.4.

determined that the Ordinance obviously served that interest because its burdensome requirements — passing the 200-question written examination, acquiring a business license, and paying the various related fees — would discourage potential fraudsters from invading Charleston's tourism industry and ensure that tour guides possess adequate knowledge about Charleston's history.

On appeal, the parties do not seriously dispute those determinations. And like the district court, we are satisfied that the City has a significant interest in protecting Charleston's tourism industry and visitors from harms perpetrated by unknowledgeable or fraudulent tour guides. *See Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 339 (4th Cir. 2005) (observing that the government's interest in protecting the public from fraud is "a sufficiently substantial interest to justify a narrowly tailored regulation" (internal quotation marks omitted)). We also readily conclude that the Ordinance serves — at least to some extent — the City's interest in protecting Charleston's tourism industry. *See Kagan*, 753 F.3d at 561 (ruling that New Orleans's tour guide licensing scheme furthers a significant governmental interest because it promotes the city and "protect[s] visitors there as they see and enjoy all of the attractions of New Orleans; its history and sights on to its food and music").

In short, we emphasize that Charleston is a historic city, known the world over, that ranks among our country's most popular tourist destinations. Of course, the City has a significant interest in protecting Charleston's tourism industry and its stellar reputation as a tourist destination. And we recognize that the Ordinance and its mandatory licensing scheme serve those interests. Our inquiry, however, does not end there, as the

22

constitutionality of a law that restricts protected speech does not turn solely on the significance of the governmental interest involved. Rather, to zealously safeguard the right to free speech enshrined in our Constitution's First Amendment — undoubtedly among the most fundamental of American rights — we must also ensure that the government's chosen method for protecting its significant interests is not too broad. In other words, we must examine whether the speech-restricting law at issue — here, the Ordinance — is narrowly tailored.

2.

In assessing whether the Ordinance is narrowly tailored to serve the City's interest in protecting Charleston's tourism industry, we consider whether the Ordinance "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *See Ward*, 491 U.S. at 799. Of course, the Ordinance need not be "the least restrictive or least intrusive means of" serving the City's interests, but the City may not "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. at 798-99.

a.

In these proceedings, the district court deemed itself constrained to rule that the Ordinance is not narrowly tailored because the City did not satisfy the evidentiary standards specified in our *Reynolds* decision. Specifically, the court concluded that the City failed to meet its burden to produce evidence that it actually tried or considered less-speech-restrictive alternatives before adopting the Ordinance. Although the court recognized in its Trial Order that several witnesses *thought* less-speech-restrictive alternatives to the

23

Ordinance would not adequately protect Charleston's tourism industry, the court dismissed that testimony as merely "post-hoc justification" for the Ordinance. *See* Trial Order 31.

On appeal, the City contends that the district court misapplied our *Reynolds* decision.[7] To that end, the City maintains that it was not required to try or consider less-speech-restrictive alternatives before adopting the Ordinance because (1) those alternatives would not have been as effective as the Ordinance, and (2) the Ordinance imposes such a slight burden on speech that any alternative could not possibly impose a less onerous burden.[8] The Plaintiffs respond that the court properly applied *Reynolds* and that the City failed to meet its evidentiary burden thereunder.

In *Reynolds*, our Court evaluated a Henrico County, Virginia ordinance that banned panhandling and several other forms of solicitation on all county highways. In reversing

---

[7] The City — "[o]ut of an abundance of caution" and as an alternative argument in case we "find the district court's view of *Reynolds* to be correct" — urges us to consider overruling *Reynolds*. *See* Br. of Appellant 2 n.3. Of course, we must reject that invitation out of hand, as we are powerless to overrule the decision of a prior panel of this Court. *See McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc) (explaining the "basic principle that one panel cannot overrule a decision issued by another panel").

[8] Additionally, the City — apparently believing that it has ensnared the district court in a series of fatal contradictions — complains that the court applied *Reynolds* differently in the Trial Order than it did in the Initial Order and the Summary Judgment Order. Any such inconsistencies would not be remarkable, however, as the court's view of whether the City satisfied *Reynolds*'s evidentiary requirements could certainly change at each successive stage of the litigation. *Cf. Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1118 (2020) (explaining that the law-of-the-case doctrine "poses no bar to the assessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims").

24

the district court's decision that the ordinance did not run afoul of the First Amendment, we set forth the evidentiary standards that a governmental entity must meet to satisfy intermediate scrutiny. As it relates to the narrow-tailoring requirement, we made clear that "intermediate scrutiny . . . require[s] the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." *See Reynolds*, 779 F.3d at 229. And we further explained that "the burden of proving narrow tailoring requires the [government] to *prove* that it actually *tried* other methods to address the problem." *Id.* at 231.

The evidentiary standards that we identified in *Reynolds* were derived from the Supreme Court's *McCullen* decision. Therein, the Court concluded that the Commonwealth of Massachusetts had not demonstrated that its speech-burdening law was narrowly tailored because it offered only uncorroborated assertions that it had tried other methods to protect its interests and that those methods had failed. *See McCullen*, 573 U.S. at 496 ("Given the vital First Amendment interests at stake, it is not enough for [the government] simply to say that other approaches have not worked."). In rejecting Massachusetts's narrow-tailoring argument, the Court underscored that Massachusetts had "not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor ha[d] it shown that it considered different methods that other jurisdictions have found effective." *Id.* at 494. Without such a *showing* by Massachusetts, said the Court, the law could not be considered narrowly tailored. *Id.* at 495 ("To meet the requirement of narrow tailoring, the government must *demonstrate* that alternative

25

measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." (emphasis added)).

Read together, *Reynolds* and *McCullen* establish the following rule:  To prove that a content-neutral restriction on protected speech is narrowly tailored to serve a significant governmental interest, the government must, inter alia, present evidence showing that — before enacting the speech-restricting law — it "seriously undertook to address the problem with less intrusive tools readily available to it."  *See McCullen*, 573 U.S. at 494.  In other words, the government is obliged to demonstrate that it actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest.  *Id.*; *see also Reynolds*, 779 F.3d at 231-32.  The government's burden in this regard is satisfied only when it presents "actual evidence supporting its assertion[s]."  *See Reynolds*, 779 F.3d at 229.[9]

b.

Here, the Plaintiffs identify two readily available, less-speech-restrictive alternatives that they claim the City should have tried to use to regulate tour guides before enacting the Ordinance — that is, the City's existing deceptive solicitation and business

---

[9] Of course, in interpreting *Reynolds* and *McCullen*, we do not intend to suggest that actually trying or considering less-speech-restrictive alternatives is the sole requirement of narrow tailoring.  Rather, we emphasize that producing evidence demonstrating such efforts is necessary, but not sufficient, to satisfy the narrow-tailoring standard.  After all, even if a governmental entity has tried or considered a less-speech-restrictive alternative, it still must prove that the law in dispute does not "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."  *See Ward*, 491 U.S. at 799.

licensing ordinances. Additionally, the Plaintiffs identify a third alternative that they claim the City should have at least considered — a voluntary tour guide certification program similar to those used by other local governments around the country. In response, the City maintains that all three alternatives would fail to adequately protect Charleston's tourism industry. To corroborate that contention, however, the City merely offers testimony from its officials regarding the predicted ineffectiveness of the suggested alternatives. Such testimony, without more, is not sufficient to satisfy the evidentiary standards established by *Reynolds* and *McCullen*.

As it relates to the two readily available alternatives that are already on the books — the deceptive solicitation and business licensing ordinances — the City claims that those ordinances would not adequately safeguard its interests. As previously mentioned, Daniel Riccio, the City's Director of Livability, testified that it would be "impractical from an enforcement standpoint" to regulate tour guides using that ordinance because it was passed to regulate aggressive timeshare salespeople. *See* J.A. 380. And former Mayor Joseph Riley explained that the deceptive solicitation ordinance would be difficult to enforce because, rather than submitting complaints about dishonest tour guides to the City, disappointed tourists would simply "go home and tell people that you get ripped off in Charleston." *Id.* at 253. The City presents no evidence, however, demonstrating that it considered or attempted using the deceptive solicitation ordinance to regulate tour guides before it enacted the Ordinance.

Additionally, the City maintains that its business licensing ordinance would not adequately protect its interests. The City relies on Riccio's testimony to contend that it

27

cannot regulate tour guides by revoking their business licenses because a guide could avoid that sanction by starting a new company with a different name and obtaining a new business license. But again, the City has offered no evidence showing that it considered or tried using the business licensing ordinance to regulate tour guides before enacting the Ordinance, nor has the City shown that a guide has ever established a new company to circumvent the suspension of a business license.

In short, although the City provides myriad post-hoc justifications for why the deceptive solicitation and business licensing ordinances could not be used to effectively regulate tour guides, it failed to produce evidence demonstrating that it "seriously undertook" to utilize those ordinances for such a purpose before enacting the Ordinance and its mandatory licensing scheme. *See McCullen*, 573 U.S. at 494. Absent such a showing, we cannot simply accept the City's assurances that those other ordinances would be too difficult to enforce or would not sufficiently safeguard its interest in protecting its tourism industry.[10]

---

[10] In fact, in its *McCullen* decision, the Supreme Court determined that similar uncorroborated assurances from Massachusetts were not sufficient to satisfy the narrow-tailoring evidentiary burden. More specifically, Massachusetts contended that it had to establish buffer zones around abortion clinics to protect the clinics' patrons because other methods — in particular, different laws already on the books and individual injunctions — had failed to achieve that goal. The Court, however, flatly rejected that contention because no evidence supported it. *See McCullen*, 573 U.S. at 494 (rejecting Massachusetts's argument because it failed to identify "a single prosecution brought under those [other] laws within at least the last 17 years" and "the last injunctions [it] cite[s] date to the 1990s"). In an attempt to overcome that lack of evidence, Massachusetts maintained that prosecuting individuals under other laws or using individual injunctions would be impractical and would make the Commonwealth's job more difficult. The Court remained unpersuaded, however, stating "[o]f course [the buffer zone] would [be easier to enforce]. (Continued)

Finally, the Plaintiffs propose a third alternative — a voluntary tour guide certification program similar to those successfully used by other great American cities, including historic municipalities like Baltimore and Chicago. The Plaintiffs contend that the City should have seriously considered, before enacting the Ordinance, whether a voluntary certification program could be used in Charleston to regulate tour guides. As the Plaintiffs emphasize on appeal, such a voluntary program provides tour guides with opportunities to "obtain a competitive advantage (and government recommendation) by passing a test and obtaining a credential." *See* Br. of Appellees 19. And unlike the City's existing deceptive solicitation and business licensing ordinances, a voluntary certification program speaks directly to the City's interest in ensuring that tour guides have a base level of knowledge and competency. Under the voluntary certification program supported by the Plaintiffs, prospective tour guides who meet the certification requirements could advertise their tours as certified — for example, by wearing special insignia — and the City could compile a list of certified guides for distribution to visitors. In other words, such a voluntary certification program would protect the City's tourism industry by encouraging visitors to patronize certified tour guides who satisfy standards established by the City — all without infringing the Plaintiffs' free speech rights.

The City, on the other hand, has given short shrift to the idea of a voluntary tour guide certification program. Specifically, the City has failed to offer evidence

But that is not enough to satisfy the First Amendment." *Id.* at 495. For similar reasons, we cannot accept the City's uncorroborated statements regarding the impracticality of using the deceptive solicitation and business licensing ordinances to regulate tour guides.

29

demonstrating that it seriously considered a voluntary certification program before enacting the Ordinance — such as, evidence that it conducted cost-benefit analyses, sanctioned formal reports, held workshops with city leaders, or spoke with leaders of other cities that have successfully implemented such a program. Rather, the City relies on the testimony of Riccio that a voluntary certification program "would be impractical," *see* J.A. 378, and the testimony of Riley that such a program would not have "the accuracy or the excellence or the quality" of the Ordinance's mandatory certification program, *id.* at 249. That testimony, however, is simply not sufficient to satisfy the City's burden, as it is merely post-hoc justification for why City officials believe a voluntary tour guide certification program would not adequately protect its interests. Without unnecessarily specifying the precise process a governmental entity should employ in considering less-speech-restrictive alternatives used by other jurisdictions, we confidently say that outright rejection on impracticality grounds — absent any serious consideration whatsoever — does not suffice.

At bottom, because the City failed to provide evidence that — before enacting the Ordinance — it attempted to use "less intrusive tools readily available to it" (the existing deceptive solicitation and business licensing ordinances) or that it ever seriously "considered different methods that other jurisdictions have found effective" (a voluntary tour guide certification program), we are satisfied that the City has not established that the Ordinance is narrowly tailored. *See McCullen*, 573 U.S. at 494; *see also Edwards*, 755 F.3d at 1009 ("In sum, [D.C.] has provided no convincing explanation as to why a more finely tailored regulatory scheme would not work."). We therefore conclude that the

30

district court correctly declared the Ordinance unconstitutional, as it cannot survive intermediate scrutiny.[11]

## IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*

---

[11] Ordinarily, in applying intermediate scrutiny, we would also have to consider whether the Ordinance leaves open ample alternative channels of communication. Because the City has failed to establish that the Ordinance is narrowly tailored, however, we need not address and resolve that issue. *See Reynolds*, 779 F.3d at 232 n.5.